1  Logan M. Elliott (SBN 268105)
2  lelliott@willkie.com
   Marina A. Torres (SBN 259576)
3  mtorres@willkie.com
4  WILLKIE FARR & GALLAGHER LLP
   2029 Century Park East, Suite 2900
5  Los Angeles, California 90067
   Telephone: (310) 855-3000
6  Facsimile: (310) 855-3099
7
   Michael J. Gottlieb (*Pro hac vice forthcoming*)
8  mgottlieb@willkie.com
9  Samuel Hall (*Pro hac vice forthcoming*)
   shall@willkie.com
10 WILLKIE FARR & GALLAGHER LLP
11 1875 K Street, N.W.
   Washington, DC 20006
12 Telephone: (202) 303-1000
   Facsimile: (202) 303-2000
13 Attorneys for Plaintiffs Patrick McKillen
14 and Hume Street Management Consultants Limited

15          UNITED STATES DISTRICT COURT
16          CENTRAL DISTRICT OF CALIFORNIA
17

18 | Patrick McKillen and Hume Street | ) | CASE NO.:  2:25-cv-03545 |
   | Management Consultants Limited, | ) | |
19 | | ) | |
   | Plaintiffs, | ) | **COMPLAINT FOR** |
20 | | ) | **VIOLATIONS OF FEDERAL** |
   | v. | ) | **RACKETEER INFLUENCED** |
21 | | ) | **AND CORRUPT** |
   | Sheikh Hamad Bin Khalifa Bin Hamad Bin | ) | **ORGANIZATIONS ACT** |
22 | Abdullah Bin Jassim Bin Mohammed Al | ) | **("RICO"), 18 U.S.C. §§ 1962,** |
   | Thani, Sheikh Hamad Bin Jassim Bin Jaber | ) | **1964** |
23 | Bin Mohammed Bin Thani Al Thani, | ) | |
   | Sheikha Lulwah Bint Hamad Bin Khalifa | ) | |
24 | Al Thani, Michele Faissola, Marc Socker, | ) | **DEMAND FOR JURY TRIAL** |
25 | Dilmon LLC, Maybourne Hotels Limited, | ) | |
   | and Beverly Hills Acquisition LLC, | ) | |
26 | | ) | |
   | Defendants. | ) | |
27 | | ) | |
28

---

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

Plaintiffs Patrick McKillen ("Mr. McKillen") and Hume Street Management Consultants Limited ("HSMC"), by their undersigned counsel, hereby bring this action under 18 United States Code Sections 1962(c), 1962(d), and 1964(c) against defendants Sheikh Hamad bin Khalifa bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani ("Sheikh Hamad bin Khalifa" and commonly known as "HBK"), Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani ("Sheikh Hamad bin Jassim" and commonly known as "HBJ," and together with Sheikh Hamad bin Khalifa, the "Qatari Royals"), Sheikha Lulwah bint Hamad bin Khalifa Al Thani ("Sheikha Lulwah"), Michele Faissola, Marc Socker,[1] Dilmon LLC ("Dilmon"), Maybourne Hotels Limited, and Beverly Hills Acquisition LLC.[2]  Plaintiffs allege, on information and belief, as follows:

## SUMMARY OF THE ACTION

1.  Over the past seven years, members of the Qatari royal family, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, orchestrated, directed, and participated in a global scheme to defraud their former business partner, Patrick McKillen, and his company, HSMC.  The Qatari Royals effectuated this lawless plot using individuals and entities within their control to defraud Mr. McKillen and HSMC, causing Mr. McKillen and HSMC to expend significant resources on the Qatari Royals' behalf under false pretenses and without remuneration.  These schemes to defraud their business partner and his company for, put crudely, free labor are part of a years' long pattern of illegal racketeering orchestrated by the Qatari Royals, and are in line with a history of illicit, lawless actions.

---

[1] The Qatari Royals, Sheikha Lulwah, Michele Faissola, and Marc Socker are referred to herein as the Individual Defendants.

[2] Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC are referred to herein as the Entity Defendants.

2.      Mr. McKillen is a renowned hotelier, property investor, developer, and entrepreneur with decades of experience managing and redeveloping ultra-luxury hotels.  Mr. McKillen provides management and redevelopment services through his company, HSMC.

3.      In 2004, Mr. McKillen acquired shares in a group of luxury hotels that then became known as the Maybourne Hotel Group (or "Maybourne").  Mr. McKillen dedicated nearly twenty years to transforming the Maybourne hotels, elevating them to top ultra-luxury destinations around the globe.

4.      In 2015, Mr. McKillen sold his shares in Coroin Limited ("Coroin"), the holding company of the Maybourne Hotel Group, to Séléné S.À R.L., a company owned by Sheikh Hamad bin Jassim.[3]  The sale of Mr. McKillen's shares was subject to arrangements for him to receive further consideration based on any net increase in the value of the Maybourne Hotel Group over a period ending at the latest in April 2022 through a deferred payment (the "Deferred Payment").  The Deferred Payment is the subject of a confidential arbitration in London in which Mr. McKillen alleges that a very substantial sum is owed to him by the Qatari Royals.

5.      During that period following the sale, Mr. McKillen and, later, his company, HSMC, continued to manage and redevelop the Maybourne hotels, at the direction of the Qatari Royals, including such hotels as Claridge's, The Connaught, The Berkeley, and a property adjacent to The Berkeley that had been purchased in 2005, and which was later developed into a new hotel, The Emory. Mr. McKillen, and later HSMC, managed and redeveloped Claridge's, The Connaught and The Berkeley for an agreed upon management fee (which was separate from and in addition to Mr. McKillen's entitlement to the Deferred

---

[3] Sheikh Hamad bin Khalifa acquired an interest in the Maybourne Hotel Group in 2017.

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

Payment for his shares). Mr. McKillen led the expansion and transformation of these hotels into ultra-luxury properties fit for the 21st century with a new generation of guests, while preserving their individual character and distinctive history fit for kings, queens, royal families, and celebrities.

6. However, it was not long before Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim developed, implemented, and participated in several schemes to defraud Mr. McKillen. Having seen the value their business partner brought to the table, the Qatari Royals calculated that they could steal millions of dollars in Mr. McKillen's and HSMC's services to further their own personal and investment ends with respect to upcoming hotel projects for which they knew they would need Mr. McKillen's expertise, and conspired to do so.

7. The schemes were straightforward. Starting in 2018, the Qatari Royals, using the Entity Defendants, Sheikha Lulwah, Mr. Faissola, Mr. Socker, and various other individuals and entities within their control, engaged Mr. McKillen and his companies to manage and/or completely redevelop four additional luxury properties: (1) the Maybourne Riviera hotel in 2018; (2) a Manhattan mansion owned by Sheikh Hamad bin Jassim in 2018; (3) the historic Îlot Saint-Germain building in 2019; and (4) the Maybourne Beverly Hills hotel in 2019. For each project, the Qatari Royals represented to Mr. McKillen at the outset that he would be compensated via fees for services performed. But at some time in the course of Mr. McKillen's and/or HSMC's work, the Qatari Royals decided, in secret, that they would not, in fact, be compensating Mr. McKillen or HSMC for services performed on the four projects, and would instead fraudulently induce him and/or his company to continue work. In accordance, and under false pretenses, Mr. McKillen and/or HSMC thereafter worked hard and expended significant time and resources on these projects for the benefit of the Qatari Royals. And once millions of dollars in benefit to the Qatari Royals had been realized—and expended by Mr. McKillen and/or HSMC—the

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP

2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

Defendants refused to compensate Mr. McKillen or HSMC for nearly all their efforts and absconded with their vision and hard work, essentially free of charge (the "Riviera Fraud," the "California Fraud," the "Saint-Germain Fraud," and the "New York Fraud," discussed *infra*).  To date, the Qatari Royals have refused to pay Mr. McKillen or HMSC the fees they are rightfully owed, accounting for years of labor by Mr. McKillen and/or HMSC.  Indeed, rather than pay Mr. McKillen the fees he is owed, the Qatari Royals have instead engaged in an additional scheme to pressure him into dropping his demands (the "Quintet Scheme," discussed *infra*).

8.　　Although Mr. McKillen once believed he had a good-faith business relationship with the Qatari Royals, he now believes that, once the projects were underway, the Qatari Royals decided not to pay him and/or HSMC the fees under the agreed-to terms, and instead sought to trick them into continuing to provide services for years under false pretenses, only to systematically fabricate reasons not to pay them out of whole cloth.

9.　　What is more, these acts are part of a larger, global pattern of unlawful activities perpetrated by the Qatari Royals in their business and political dealings to unfairly reap rewards on the backs of free laborers, evidencing that the Qatari Royals consider themselves to be above the law.[4]  The defrauding of Mr. McKillen takes its place in line next to a laundry list of illegal acts directed and facilitated by the Qatari Royals and the entities and individuals they control to grow their wealth or advance their geopolitical interests.  Mr. McKillen fell victim to these tactics in good faith.

---

[4] *See, e.g., Qatar: Six Months Post-World Cup, Migrant Workers Suffer, FIFA/Qatari Authorities Paid No Compensation, Silent on Wage Theft,* HUMAN RIGHTS WATCH (June 16, 2023), https://www.hrw.org/news/2023/06/16/qatar-six-months-post-world-cup-migrant-workers-suffer.

## PARTIES

10.    Plaintiff Patrick McKillen is a citizen of Ireland and the United Kingdom.  He is a world-renowned hotelier, property investor and developer, and businessman with significant experience in the ultra-luxury hotel sector.  He is also the owner and company director of HSMC.

11.    Plaintiff HSMC is an Irish corporation with its principal place of business in Dublin, Ireland.  HSMC manages a portfolio of properties on Mr. McKillen's behalf and has successfully provided hotel and project management services in respect of multiple hotels in the Maybourne Hotel Group.

12.    Defendant Sheikh Hamad bin Khalifa is a citizen of Qatar who resides in Doha, Qatar.  Sheikh Hamad bin Khalifa was the Emir of Qatar from 1995 to 2013 and is a member of the Qatari royal family of Al Thani.  Sheikh Hamad bin Khalifa is the ultimate beneficial owner of the Maybourne Beverly Hills.  Through the hotel, he regularly transacts business in California and enjoys the privileges of transacting business in Los Angeles County.  Sheikh Hamad bin Khalifa, alongside his business partner Sheikh Hamad bin Jassim, directly or through his agents and/or representatives, devised, orchestrated, directed, facilitated, and participated in the schemes to defraud Mr. McKillen described herein.

13.    Defendant Sheikh Hamad bin Jassim is a citizen of Qatar who has a dwelling in Los Angeles, California.  Sheikh Hamad bin Jassim regularly transacts business in California and enjoys the privileges of transacting business in Los Angeles County through the Maybourne Beverly Hills, and other ventures. Sheikh Hamad bin Jassim served as Foreign Minister of Qatar from 1992 until 2013 and as Prime Minister from 2007 to 2013.  Sheikh Hamad bin Jassim is also a member of the Al Thani royal family and holds official diplomatic positions for Qatar.  Sheikh Hamad bin Jassim, alongside his business partner Sheikh Hamad bin Khalifa, directly or through his agents and/or representatives, devised,

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA  90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

1  orchestrated, directed, facilitated, and participated in the schemes to defraud Mr.
2  McKillen described herein.

3      14.    Defendant Sheikha Lulwah is a citizen of Qatar who resides in
4  Doha, Qatar.  Sheikha Lulwah is the daughter of Sheikh Hamad bin Khalifa and
5  assists her father with his hotel investments.  Sheikha Lulwah regularly transacts
6  business in California and enjoys the privileges of transacting business in Los
7  Angeles County through the Maybourne Beverly Hills.  Sheikha Lulwah, directly
8  or through her agents and/or representatives, directed, facilitated, and
9  participated in at least one of the schemes to defraud Mr. McKillen described
10  herein, including by engaging Plaintiffs for their services, directing and
11  approving their work even after the Qatari Royals decided to refuse them
12  compensation, and ultimately refusing them compensation once a material
13  benefit to the Qatari Royals had been realized.

14      15.    Defendant Michele Faissola is a citizen of Italy who resides in
15  London, England.  Mr. Faissola is Chief Executive Officer of Dilmon and has
16  worked as an advisor to the Al Thani family since January 2018.  At all times
17  relevant herein, Mr. Faissola acted as an agent of Sheikh Hamad bin Khalifa,
18  Sheikha Lulwah, and the Entity Defendants with respect to the Qatari Royals'
19  hotel investments.  Mr. Faissola directed, facilitated, and participated in schemes
20  to defraud Mr. McKillen on behalf of the Qatari Royals, including by engaging
21  Plaintiffs for their services, falsely representing to Mr. McKillen that he would
22  be compensated for work performed, and refusing Plaintiffs compensation once
23  a material benefit to the Qatari Royals had been realized.

24      16.    Defendant Marc Socker is a citizen of Great Britain who resides in
25  London, England.  Mr. Socker is the Head of Real Estate of Dilmon and Co-Chief
26  Executive Officer of the Maybourne Hotel Group, which is ultimately owned by
27  Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim.  At all times relevant
28  herein, Mr. Socker acted as an agent of Sheikh Hamad bin Khalifa, Sheikha

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA  90067
310-855-3000

Lulwah, and the Entity Defendants with respect to the Qatari Royals' hotel investments. Mr. Socker directed, facilitated, and participated in schemes to defraud Mr. McKillen on behalf of the Qatari Royals, including by facilitating the installation of Plaintiffs as project leaders and directing and approving their work even after the Qatari Royals decided to refuse them compensation.

17. Defendant Dilmon is a Qatari company, with its principal place of business in Doha, Qatar. Dilmon is the Al Thani family office of Sheikh Hamad bin Khalifa. Dilmon regularly transacts business in California on behalf of the Al Thani family, including with respect to the Maybourne Beverly Hills. Dilmon facilitated and participated in the Riviera Fraud and the California Fraud described herein on behalf of the Qatari Royals, including by, through its officers: (i) engaging Plaintiffs for their services and installing Plaintiffs as project leaders; (ii) falsely representing to Mr. McKillen that he would be compensated for work performed; (iii) serving as Plaintiffs' primary point of contact throughout the redevelopment projects; (iv) directing and approving Plaintiffs' work even after the Qatari Royals decided to refuse them compensation; and (v) refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

18. Defendant Maybourne Hotels Limited is an English company with its principal place of business in London, England. Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim are the ultimate controlling parties of Maybourne Hotels Limited. Maybourne Hotels Limited provides centralized back-office support services to the Maybourne Hotel Group's hotel assets and receives a portion of each hotel's revenue. Maybourne Hotels Limited regularly transacts business in California on behalf of Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim with respect to the Maybourne Beverly Hills. Maybourne Hotels Limited participated in schemes to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim, including by

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

19.     Defendant Beverly Hills Acquisition LLC is a Delaware limited liability company, which is registered to do business in the State of California. Upon information and belief, Beverly Hills Acquisition LLC operates solely in Beverly Hills, California, with an address at 225 N. Canon Drive, Beverly Hills, CA 90210.  Beverly Hills Acquisition LLC is the direct owner of the Maybourne Beverly Hills.  Sheikh Hamad bin Khalifa is the ultimate beneficial owner of Beverly Hills Acquisition LLC.  Beverly Hills Acquisition LLC owns and operates the Maybourne Beverly Hills and thereby is essentially at home in California.  Beverly Hills Acquisition LLC participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Khalifa, including by refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

## NON-PARTY MEMBERS OF THE ENTERPRISE

20.     SEDHV is a French company beneficially owned by Sheikh Hamad bin Khalifa.  SEDHV is the direct owner of the Maybourne Riviera, a hotel complex located in the Alpes Maritimes, at 1551, Route de la Turbie, Roquebrune-Cap-Martin (06190).  SEDHV facilitated and participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Khalifa, including by engaging Plaintiffs for their services, falsely representing to Plaintiffs that they would be compensated for work performed, unilaterally terminating its working relationship with Plaintiffs by interfering with the completion of Plaintiffs' work, and refusing Plaintiffs full compensation once a material benefit to the Qatari Royals had been realized.

21.     Gilles de Boissieu is the chairman of SEDHV.  Mr. de Boissieu facilitated and participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Khalifa, including by engaging Plaintiffs for their

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

services, falsely representing to Plaintiffs that they would be compensated for work performed, and refusing Plaintiffs full compensation once a material benefit to the Qatari Royals had been realized.

22.    Constellation Paris is a French company beneficially owned by Sheikh Hamad bin Jassim.  Sheikh Hamad bin Jassim created Constellation Paris to purchase the historic Îlot Saint-Germain building, located at 231 Boulevard Saint-Germain - 75007 Paris.  Constellation Paris facilitated and participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Jassim, including by engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

23.    Fady Bakhos is Chairman of Constellation Paris and a longtime advisor to the Al Thani royal family.  Bakhos facilitated and participated in a scheme to defraud Mr. McKillen described herein on behalf of Sheikh Hamad bin Jassim, including by engaging Plaintiffs for their services, directing and approving their work, and refusing Plaintiffs compensation once a material benefit to the Qatari Royals had been realized.

24.    Quintet Private Bank SA ("Quintet" or the "Bank") is a Luxembourg company, beneficially owned by Sheikh Hamad bin Jassim since 2011.  The Qatari Royals utilized Quintet to induce Mr. McKillen into a refinancing only to pull the offer in bad faith after Mr. McKillen and his company were effectively deprived of the ability to pursue other refinancing options in the market to attempt to intimidate Mr. McKillen into dropping his efforts to obtain the fees he and HSMC are owed.

## JURISDICTION AND VENUE

25.    This Court has original subject matter jurisdiction over the claim for relief asserted in this complaint pursuant to 28 United States Code Section 1331,

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

as 18 United States Code Section 1964(c) arises under the laws of the United States.

26.    This Court has personal jurisdiction over Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon on the basis of their substantial, continuous, and systematic contacts with California.  On information and belief, each of these defendants owns, operates, and/or manages properties in California and continuously transacts business in the forum.  These contacts with the forum are so wide-ranging that they take the place of physical presence in the forum.  In addition, or in the alternative, this Court has personal jurisdiction over Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon because, among other contacts in the state, they devised, orchestrated, directed, facilitated, and/or participated in the scheme to defraud Mr. McKillen that was centered in and directed at California.  In furtherance of this scheme, Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon, directly or through their officers, agents, or representatives, intentionally directed their unlawful acts at California and ultimately derived the fruits of their unlawful acts in California.  Plaintiffs' action here arises out of Sheikh Hamad bin Khalifa, Sheikha Lulwah, and Dilmon's contacts with this forum: their ownership of and/or financial interest in the Maybourne Beverly Hills, which is located in California; their engaging Mr. McKillen to perform services in California; and their refusal to compensate Plaintiffs for work performed for the Qatari Royals' enrichment in California.

27.    This Court has personal jurisdiction over Sheikh Hamad bin Jassim because he maintains a dwelling in Los Angeles, California.  In addition, or in the alternative, this Court has personal jurisdiction over Sheikh Hamad bin Jassim because, among other contacts in the state, he devised, orchestrated, directed, facilitated, and/or participated in the scheme to defraud Mr. McKillen described herein that was centered in and directed at California.  In furtherance of this scheme, Sheikh Hamad bin Jassim, directly or through his agents or

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA  90067
310-855-3000

1    representatives, intentionally directed his unlawful acts at California and

2    ultimately derived the fruits of his unlawful acts in California. Plaintiffs' action

3    here arises out of Sheikh Hamad bin Jassim's contacts with this forum: his

4    financial interest in the Maybourne Beverly Hills, which is located in California,

5    his meetings with Mr. McKillen concerning the California Fraud in California,

6    and his refusal to compensate Plaintiffs for work performed for his own

7    enrichment in California.

8        28.    This Court has personal jurisdiction over Mr. Faissola and Mr.

9    Socker because, among other contacts in the state, each directed, facilitated,

10   and/or participated in the scheme to defraud Mr. McKillen described herein that

11   was centered in and directed at California. In furtherance of this scheme, Mr.

12   Faissola and Mr. Socker, directly and/or through their agents or representatives,

13   intentionally directed their unlawful acts at California. Plaintiffs' action here

14   arises out of Mr. Faissola and Mr. Socker's contacts with this forum: their

15   engaging Mr. McKillen to perform services in California; their directing Mr.

16   McKillen to perform services in California and approving such services on false

17   pretenses; and/or their refusal to compensate Plaintiffs for work performed in

18   California for the Qatari Royals' enrichment.

19       29.    This Court has personal jurisdiction over Maybourne Hotels Limited

20   because Maybourne Hotels Limited, among other contacts in the state,

21   participated in the scheme to defraud Mr. McKillen described herein that was

22   centered in and directed at California. Maybourne Hotels Limited purposefully

23   directed its unlawful acts at California, derived benefits from its unlawful acts in

24   California, and availed itself of the privilege of conducting business in California.

25   Plaintiffs' action here arises out of Maybourne Hotels Limited's contacts with

26   this forum, including its refusal to compensate Plaintiffs for work performed in

27   California for the Qatari Royals' enrichment.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

30.     This Court has personal jurisdiction over Beverly Hills Acquisition LLC because it directly owns the Maybourne Beverly Hills and operates its business solely in Beverly Hills, California.  Beverly Hills Acquisition LLC, through the hotel it owns and operates in California, maintains a continuous presence in this forum, offers accommodations and services to people in this forum, and profits from its activities in this forum.  Beverly Hills Acquisition LLC's affiliation with this forum is so continuous and systemic that it is essentially at home in this forum.  In addition, or in the alternative, this Court has personal jurisdiction over Beverly Hills Acquisition LLC because, among other contacts in the state, Beverly Hills Acquisition LLC participated in a scheme to defraud Mr. McKillen that was centered in and directed at California.   In furtherance of this scheme, Beverly Hills Acquisition LLC participated in the unlawful scheme in California and ultimately derived the fruits of its unlawful acts in California.  Plaintiffs' action here arises out of Beverly Hills Acquisition LLC's contacts with this forum: its ownership of and financial interest in the Maybourne Beverly Hills, which is located in California, and its refusal to compensate Plaintiffs for work performed in California for the Qatari Royals' enrichment.

31.     Venue is proper in the Central District of California under 28 United States Code Section 1391(b)(2) because a substantial part of Plaintiffs' injuries and the events or omissions giving rise to them occurred in Beverly Hills, California.  Defendants engaged in unlawful acts with the aim and effect of injuring Plaintiffs in Beverly Hills, California, where Plaintiffs accrued expenses and performed services for which they did not receive compensation.  Plaintiffs' cause of action arises out of Defendants' unlawful actions in and intentionally aimed at California with respect to Plaintiffs' services rendered in California, wherein Defendants realized the benefit of their unlawful activities.

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

## BACKGROUND

32.    The Maybourne Hotel Group is a group of companies that owns and operates ultra-luxury hotels worldwide under the Maybourne brand.   Mr. McKillen's involvement with the Maybourne Hotel Group began in 2004 when a consortium of British and Irish investors, including Mr. McKillen, acquired shares in a group of luxury hotels previously known as the Savoy Group. Following this acquisition, and the sale of the Savoy Hotel, the group became known as the Maybourne Hotel Group, then comprising three hotels: Claridge's, The Connaught, and The Berkeley.

33.    Shortly thereafter, Mr. McKillen undertook the expansion, renovation, and redevelopment of the Maybourne Hotel Group's hotels, beginning with The Connaught.  Over the next few years, Mr. McKillen invested significant time, resources, and care into planning the transformation of additional Maybourne hotels, including Claridge's and The Berkeley, with the aim of cementing them as world-leading ultra-luxurious hotels fit for royalty.

34.    In 2015, Mr. McKillen sold his shares in the Maybourne Hotel Group to Séléné S.À R.L., a company owned by Sheikh Hamad bin Jassim.  The sale of Mr. McKillen's shares was (i) in exchange for initial consideration and (ii) subject to arrangements for him to receive further consideration based on any net increase in the value of the Maybourne Hotel Group over a period ending at the latest in April 2022 (i.e., the Deferred Payment).

35.    Later, Sheikh Hamad bin Jassim and Sheikh Hamad bin Khalifa split ownership of the Maybourne Hotel Group between themselves.

36.    Over the next few years, Mr. McKillen continued to manage and redevelop the Maybourne Hotel Group and its hotels.  During this period, Mr. McKillen managed, expanded, and redeveloped Claridge's, The Connaught, and

The Berkeley, in addition to developing a new hotel, The Emory, and elevated these hotels to top ultra-luxury destinations worldwide.[5]

37.    These projects were extremely successful, and there is ample evidence that the value of the Group soared due to Mr. McKillen's efforts. As just one example, Mr. McKillen transformed Claridge's, doubling the size of the hotel by hiring a team of engineers and miners to construct multiple subterranean floors beneath the hotel complete with a health club, gym, spa, pools, shops, and kitchens and adding two new floors of guest suites and a penthouse suite to the roof of the hotel.[6] This also included the addition of many new restaurants, guest suites and room refurbishments, and luxurious redevelopment of the hotel's common areas. The penthouse suite now has a going rate of approximately £60,000 per night.[7]

38.    Although Mr. McKillen and the Qatari Royals enjoyed a productive business relationship for several years, it was not long before the Qatari Royals changed course.

39.    By 2018, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim had seen the value of Mr. McKillen's and HSMC's services and their capacity to generate wealth for the Qatari Royals. Starting that year, the Qatari Royals affirmatively engaged Mr. McKillen and/or HSMC on four new projects: the management and redevelopment of the Maybourne Riviera, the management and redevelopment of the newly branded Maybourne Beverly Hills, the construction and development of a new Parisian hotel on the site of the historic Îlot Saint-

---

[5]    *See, e.g., The Mayfair Hotel Megabuild*, BBC, https://www.bbc.co.uk/programmes/m001gqnm (last visited Nov. 14, 2024).

[6] *See* Nick Foulkes, *The man behind the most spectacular makeover in Claridge's history*, FINANCIAL TIMES (Dec. 16, 2020), https://www.ft.com/content/0b6d50b6-6f2e-430c-a6a0-13c67349f703.

[7] *See* Claire Wrathall, *Revolving sofas, a 100-inch TV and 75 Damien Hirsts: inside London's most expensive hotel suite*, FINANCIAL TIMES (Oct. 19, 2023), https://www.ft.com/content/8ef079e4-e143-4b9b-91b1-de2a58748c4c.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

Germain building, and the refurbishment of a mansion in Manhattan to serve as the personal residence of Sheikh Hamad bin Jassim.  Mr. McKillen and/or HSMC accepted each engagement on the understanding that they would be compensated through fees for services rendered—in line, of course, with normal business practices, as well as the historical business relationship with the Qatari Royals.

40.    Once these oft-simultaneous projects began, however, the Qatari Royals saw an opportunity to increase their profits thereon—and took it.  They calculated that they could defraud Mr. McKillen for years' worth of free services in relation to these ongoing projects by stringing him and HSMC along under false representations that they would be compensated for services performed, when in fact the Qatari Royals now had no intention of paying Mr. McKillen or his companies fair compensation.  Accordingly, the Qatari Royals orchestrated a series of schemes to defraud their business partner that would allow them to secure Mr. McKillen's and HSMC's world-class management and redevelopment expertise on a series of new luxury redevelopment projects at little to no cost.

41.    To carry out this larger plan, the Qatari Royals fraudulently engaged and/or continued to engage Mr. McKillen and HSMC for their services, through false representations that they would be compensated in fees for the fair value of their services.  Taking advantage of their trusting business partner, the Qatari Royals thereby fraudulently induced Mr. McKillen and HSMC to provide services and then denied payment based on wholly fabricated excuses.  And once the Qatari Royals realized a benefit from Plaintiffs' services on each project, they systematically stonewalled Mr. McKillen and HSMC, refusing to compensate them for many millions of dollars in services in bad faith.  Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim did not carry out these schemes alone; rather, they relied on a large network of family members, agents, representatives, and controlled entities to effectuate the schemes.

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

42.    Thus far, the Qatari Royals' schemes have gone according to plan, and they continue to operate above the law.  Indeed, to this day, the Qatari Royals wrongfully maintain their systematic refusal to fairly compensate Mr. McKillen and/or HSMC for services rendered on each of these projects and have, thus far, successfully absconded with his free labor.    The Riviera, Saint-Germain, California, and New York Frauds, as described below, are each ongoing, and Plaintiffs' injuries only build.  And, instead of paying him the fees he and his companies are owed, the Qatari Royals have instead met Mr. McKillen's demands with an additional scheme intended to intimidate him and his companies into ceasing their efforts to collect what they are owed.

43.    It is now clear that these fraudulent schemes perpetrated against Mr. McKillen are consistent with a broader pattern of unlawful activities carried out by and at the direction of the Qatari Royals through their business partners, agents, representatives, and controlled entities for their financial benefit.  Indeed, the frauds perpetrated against Mr. McKillen bear certain structural similarities to prior allegations against the Qatari Royals related to unfair labor practices, including wage theft.  It is in this broader context of the Qatari Royals' lawless means of conducting business that the schemes against Plaintiffs were orchestrated and carried out by the Qatari Royals.

## THE RIVIERA FRAUD

44.    The Maybourne Riviera, a luxury hotel located in France, was the object of the Qatari Royals' first fraud.

45.    The Maybourne Riviera was purchased by SEDHV in 2014. SEDHV's beneficial owner is Sheikh Hamad bin Khalifa and its chairman is Gilles de Boissieu.

46.    In 2016, SEDHV, with the support of Dilmon, undertook a complete rebuild of the hotel's existing infrastructure (the "Maybourne Riviera Project") and entered into an agreement with a general contractor, Vinci Construction

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

France ("Vinci Construction"). From the beginning, however, the renovation project was plagued with difficulties that delayed progress, such as strikes, legal actions, and unexpected costs.

47. Given these difficulties and the slow progress of the redevelopment, Sheikh Hamad bin Khalifa required the aid of someone who could be trusted to not only turn the Maybourne Riviera site around, but also to elevate it to a top luxury destination worldwide. As a result, the Qatari Royals sought out Mr. McKillen's services.

48. Accordingly, in 2018, Michele Faissola, Chief Executive Officer of Sheikh Hamad bin Khalifa's family office, Dilmon, approached Mr. McKillen and HSMC on behalf of Sheikh Hamad bin Khalifa to engage them to take over the Maybourne Riviera redevelopment project. Mr. McKillen had previously declined to manage the Maybourne Riviera Project on two occasions. This time, though, Mr. McKillen accepted the engagement, feeling some sympathy for Sheikh Hamad bin Jassim, whose daughter, Sheikha Lulwah, was ill at that time.

49. HSMC and SEDHV entered into a project management agreement dated September 20, 2019 (the "Riviera Agreement"), and SOF Construction SAS ("SOF"), a French company beneficially owned by Mr. McKillen and set up for the purposes of the project, entered into a general contractor agreement with SEDHV on February 5, 2021.

50. Under the Riviera Agreement, SEDHV entrusted HSMC with the responsibility to oversee the redevelopment of the Maybourne Riviera until completion of the work in November 2022, in exchange for compensation under a delineated fee structure. The fee structure provided for scheduled fixed payments throughout the duration of the project alongside a result fee, the value of which was to be determined at the conclusion of the project. The result fee owed to HSMC was to be calculated at half of the difference between the budget for the project and the actual costs incurred.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

51. But Mr. McKillen certainly did not expect that the Qatari Royals would falsely utilize the variable nature of a major portion of this amount due to HSMC as a hook upon which to withhold payment of fees in bad faith. Indeed, upon information and belief, the Qatari Royals decided not to fully compensate Mr. McKillen and HSMC upon conclusion of the project and instead sought to mislead him into providing services for free.

52. Based on a false pretense of compensation and good faith dealings, for over three years, Mr. McKillen and HSMC poured extensive time and resources into the renovation of the Maybourne Riviera, regularly reporting on their progress to Mr. Faissola, and Marc Socker, Head of Real Estate at Dilmon. They directed, supervised, and approved the selection of contractors, the design of the hotel, and construction efforts on the site. Mr. McKillen and HSMC also worked closely to improve the hotel's structure, the conception and design of the hotel, the furnishing of guest rooms, and the future profitability of the hotel by, for example, converting non-guest rooms into event spaces and adding rooftops, bars, and pools.

53. The Qatari Royals and their enterprise were pleased with this work and continued to affirm it. For instance, on September 13, 2021, Mr. Socker told Liam Cunningham, Mr. McKillen's advisor, via email, "We are delighted as always with your team's extraordinary efforts and project management."

54. Despite these efforts, Mr. McKillen's attempts to get his fees paid by the Qatari Royals were stonewalled. As early as January 22, 2021, Mr. McKillen emailed Sheikh Hamad bin Jassim and Mr. Faissola to express his frustration with the difficulty he was having in obtaining payment of outstanding hotel management fees owed to him at the time.

55. Nonetheless, continuing in good faith, Mr. McKillen and HSMC successfully completed the renovation project ahead of schedule—despite unforeseen difficulties, including uncooperative subcontractors and scheduling

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

difficulties brought about by the COVID-19 pandemic. Mr. McKillen and HSMC also made substantial improvements to the Maybourne Riviera to optimize the quality of service provided, and their work was recognized and met with praise by the media, noting, as one example, that the "transformation . . . redefined the whole area"[8] and praising Mr. McKillen for converting the site into a "dramatically beautiful property."[9,10]

56.    Despite this feat, in April 2022, Mr. McKillen and HSMC's delivery of the work was affected by a series of hostile acts undertaken by SEDHV and Maybourne Hotels Limited on behalf of the Qatari Royals, in accordance with their fraudulent scheme.

57.    The hostilities on the Maybourne Riviera Project began when Mr. McKillen and Mr. Cunningham were removed, without warning or reason, from Maybourne Hotels Limited's board of directors on April 1, 2022. Shortly thereafter, on April 13, 2022, Maybourne Hotels Limited informed Mr. McKillen via letter of its decision to prohibit SOF's legal representative and the individual in charge of the Maybourne Riviera site, Frank Sinton, from accessing the site with immediate effect and without explanation. At this time, SOF was in the process of implementing substantial resources to complete the project ahead of its November 2022 conclusion.

58.    Then, on April 21, 2022, Mr. de Boissieu informed Mr. Sinton via letter that SEDHV was terminating its agreement with SOF on the nonsensical

---

[8] Lanie Goodman, *First look at The Maybourne Riviera: the South of France's latest star*, CONDÉ NAST TRAVELER (Jan. 10, 2022), https://www.cntraveller.com/article/the-maybourne-riviera-south-of-france-hotel-review.

[9] John O'Ceallaigh, *A new icon: Maybourne Riviera stakes its claim as one of the Mediterranean's most spectacular hotels*, LUTE (Feb. 1, 2022), https://lute.co/maybourne-riviera-hotel-review-south-of-france/.

[10] The Maybourne Riviera went on to win numerous awards as early as 2022. *See* Our Awards, THE MAYBOURNE RIVIERA, https://www.maybourneriviera.com/awards/ (last visited Nov. 14, 2024).

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

grounds of SOF's abandonment of the site.  Only a few days later, on April 25, 2022 and over six months ahead of schedule, SEDHV unilaterally decided to pronounce early acceptance of the work on the Maybourne Riviera.  The Maybourne Riviera was opened to the public thereafter.

59.     Upon SEDHV terminating HSMC's contract, and despite the acclaim Mr. McKillen and HSMC's work received, SEDHV refused to pay HSMC the balance of fees owed for work performed on the Maybourne Riviera.  Instead, SEDHV fabricated disputes over payment lacking any basis in fact.  On information and belief, SEDHV has acted in this manner at the direction of the Qatari Royals.

60.     Upon completion of the project, HSMC was due a final installment of the fixed fee, as provided for under the Riviera Agreement.  Accordingly, on May 12, 2022, HSMC sent SEDHV an invoice for €2,000,000, representing the final installment.  On June 30, 2022, Mr. Cunningham provided final notice of payment to SEDHV via letter to Mr. de Boissieu.  On July 29, 2022, Diarmaid Mullarkey, Mr. McKillen's advisor and Finance Director at HSMC, reiterated final notice to SEDHV via email.

61.     But SEDHV refused to pay HSMC the balance of the fixed fee owed.  On information and belief, this refusal was made at the direction of Sheikh Hamad bin Khalifa.  On August 5, 2022, Mr. de Boissieu indicated to Mr. Cunningham via letter that SEDHV would not be paying the final installment of the fixed fee and fabricated issues with the quality of HSMC's work.  Knowing these complaints to be fabricated, HSMC reiterated its formal notice of payment of the fixed fee to SEDHV in a response letter dated September 7, 2022.  SEDHV refused to change its position.

62.     It soon became clear that SEDHV did not intend to pay its obligations to HSMC.  HSMC was also due a result fee upon completion of the project under the Riviera Agreement.  On June 30, 2022, Mr. Cunningham sent

Mr. de Boissieu formal notice of payment along with HSMC's final work report detailing the result fee owed via letter. The result fee noticed was for the amount of €17,623,119.60, calculated on the basis of half the value of cost savings in comparison to the project's budget as provided for under the Riviera Agreement and to be paid upon completion of the project. On July 1, 2022, HSMC sent SEDHV a formal invoice for this amount.

63.    But again, SEDHV refused to pay HSMC any portion of the result fee owed. On information and belief, this refusal was made at the direction of Sheikh Hamad bin Khalifa. On August 1, 2022, Mr. de Boissieu responded to Mr. Cunningham via letter indicating that SEDHV would not be paying the result fee and fabricating issues involving the quality of HSMC's work and improvements made. Mr. de Boissieu, on behalf of SEDHV, proposed an "alternative" calculation by inserting additional costs incurred, without providing any supporting evidence that these costs were actually incurred. These fabricated costs, including a fraudulent invoice from Claridge's, conveniently wiped out the prospect of any result fee being owed to HSMC. Knowing the costs to be fabricated, HSMC reiterated its formal notice of payment of the result fee to SEDHV in its response letter dated September 7, 2022.

64.    At this time, an asset seizure order is in place in France against SEDHV and for the benefit of SOF in an amount of €12.5 million.

65.    To date, the Qatari Royals and their business partners, agents, representatives, and controlled entities have refused to make Mr. McKillen and HSMC whole via fees for over three years of work on the Maybourne Riviera, choosing instead to hide behind clearly fabricated excuses. And the Qatari Royals have no intent to do so, having increased the value of their investments through the theft of Mr. McKillen and HSMC's services.

66.    The Qatari Royals furthered the Riviera Fraud through phone communications terminating in California between the Qatari Royals and/or their

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

agents, on the one hand, and Plaintiffs and/or their agents, on the other.   For instance, on March 9, 2021 and again on November 15, 2021, Sheikh Hamad bin Jassim sent Mr. McKillen voice notes via WhatsApp when both were located in California to arrange meetings at which work on the Maybourne Riviera was discussed and furthered, among other hotel projects.  What is more, throughout the Riviera Fraud, Dilmon utilized an email server located in the United States through which it routed its emails to further the scheme.[11]

## THE SAINT-GERMAIN FRAUD

67.    The Îlot Saint-Germain, the historic headquarters of the French Ministry of Defense located in Paris, France, was the object of the Qatari Royals' second fraud on Mr. McKillen and HSMC.

68.    On September 18, 2018, Sheikh Hamad bin Jassim met with Mr. McKillen in London to discuss the Sheikh's interest in acquiring the Îlot Saint-Germain building and transforming it into a luxury hotel (the "Saint-Germain Project").  Sheikh Hamad bin Jassim requested Mr. McKillen's expert opinion on whether it was a prudent investment.  Shortly thereafter, Mr. McKillen visited the Îlot Saint-Germain site and advised Sheikh Hamad bin Jassim that, indeed, it was a good investment opportunity.

69.    Trusting Mr. McKillen's counsel, Sheikh Hamad bin Jassim purchased the Îlot Saint-Germain building in 2019 through his company created specifically for the transaction, Constellation Paris.  Constellation Paris is chaired by Fady Bakhos, a longtime advisor to the Al Thani family.

70.    Immediately following the purchase, Sheikh Hamad bin Jassim returned to Mr. McKillen to ask whether Mr. McKillen would manage the project.  Sheikh Hamad bin Jassim represented to Mr. McKillen that the Saint-

---

[11] Dilmon.com is maintained on an Amazon server, whose emails appear to be routed through Princeton, New Jersey.  The domain registrar, GoDaddy.com, is based in Arizona.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

German project would be rendered and fees paid in accordance with prior hotel projects, and Mr. McKillen accepted the engagement in reliance on those representations. However, at some time during the project, the Qatari Royals saw another opportunity through which to effectuate their larger scheme and acquire Mr. McKillen's world-class services for free by inducing him to continue his services under the false representation that he would be paid. In reality, the Qatari Royals again sought to obtain as much work from Mr. McKillen and HSMC as possible before denying payment in bad faith.

71.     The volume of work the Qatari Royals were able to obtain from Mr. McKillen and HSMC with respect to planning the Saint-Germain Project (planning hereinafter referred to as "Phase 1") was significant. Sheikh Hamad bin Jassim engaged Mr. McKillen and HSMC as project managers and consultants for the project. In that role and pursuant to the agreement, Mr. McKillen and HSMC oversaw all aspects of planning to construct a new hotel in the building, complete with lounges, luxury boutiques, a wellness center, swimming pools, and a restaurant and bar. Mr. McKillen and HSMC's Phase 1 work included developing plans for the creation of the new hotel, providing input and guidance for all aspects of the Saint Germain Project, and supervising any Phase 1 tasks that occurred on-site. Further, immediately following their engagement until September 2021, Mr. McKillen and HSMC reviewed and selected contractors for the project, reviewed and provided feedback on the design and structure of the hotel, provided feedback on the project's business plan and other financial aspects, obtained administrative authorizations for the project, and played an instrumental role in presenting the project to the public on September 14, 2021. All of this preparation was essential to the actual construction of the Saint Germain Project ("Phase 2").

72.     As one example of Mr. McKillen and HSMC's centrality in the hotel's development, in an email dated March 24, 2021 to Gleeds Project &

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

Construction Management Services ("Gleeds")—the cost consultant on the project—and Vinci Immobilier, the real estate developer, Mr. Bakhos relays "instructions given by [Sheikh Hamad bin Jassim]" for Gleeds and Vinci Immobilier to develop the hotel "under Mr. McKillen's advice and guidance" and noting that the housing scheme is to be developed "in accordance with the plan to be determined by Mr. McKillen." What is more, Sheikh Hamad bin Jassim and Constellation Paris postponed meetings if Mr. McKillen was not available and took care to ensure his availability ahead of other stakeholders, given his critical role on the project.

73. The Qatari Royals continually acknowledged and affirmed Mr. McKillen and HSMC's work. For instance, on September 14, 2021, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp concerning progress on the Saint-Germain Project. He said, in relevant part, "As you probably know I'm going to Paris today to present Maybourne to the Local Mayor[.]" Sheikh Hamad bin Jassim affirmed and thanked him for his work, saying, "Well, good luck Paddy and I hope we see you soon either in Doha or in London. Thank you."

74. Notwithstanding Mr. McKillen's and HSMC's central role in the project, soon after the hotel's public unveiling, the Qatari Royals indicated to Mr. McKillen that they did not intend to compensate him for services rendered, once again fabricating excuses out of whole cloth.

75. On September 16, 2021, two days following Mr. McKillen's participation in the presentation of the new hotel to the public, Mr. McKillen, proceeding in good faith, sent Mr. Bakhos a letter containing fees owed for work performed in relation to the Saint-Germain Project. On September 26, 2021, Mr. Bakhos sent an email to Mr. Cunningham refusing to compensate Mr. McKillen and HSMC for work performed, boldly stating that "no project management work [in relation to the Saint-Germain Project] is required other than that currently

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

being carried out by Gleeds." This response was especially disingenuous in light of an email from Gleeds to HSMC sent three days earlier in which Gleeds highlighted "a number of important points relating to the planning application and detailed design development, which require [HSMC's] input."

76.     Once it became clear that the Qatari Royals had no intention to pay Mr. McKillen or HSMC for work on the Saint-Germain Project, Mr. McKillen and HSMC withdrew from the project.

77.     At this time, an asset seizure order is in place in France against Constellation Paris and for the benefit of HSMC in an amount of €20 million.

78.     To date, the Qatari Royals and their business partners, agents and representatives, and controlled entities have refused to pay Mr. McKillen or HSMC any fees whatsoever for work on the Saint-Germain Project.

79.     The Qatari Royals furthered the Saint-Germain Fraud through phone and video communications terminating in California between the Qatari Royals and/or their agents, on the one hand, and Plaintiffs and/or their agents, on the other. For instance, on March 12, 2021, while Mr. McKillen and Sheikh Hamad bin Jassim were both in Los Angeles, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp concerning progress on the Saint-Germain Project. He said, in relevant part, "Thanks for delicious lunch with your family. Spoke to Fady [Bakhos] and getting all Paris info today. Will meet team in person on 18 th [sic] in Paris . . . Let me know if you need any help with Gehry meeting." Sheikh Hamad bin Jassim responded via voice note. Further, on May 26, 2021, Sheikh Hamad bin Jassim attended a presentation concerning the Saint-Germain Project virtually via Zoom from his home in Los Angeles.

## THE CALIFORNIA FRAUD

80.     The now-branded Maybourne Beverly Hills, a luxury hotel in California, was the object of the Qatari Royals' third fraud.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

81.   In the summer of 2019, Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim took interest in expanding the Maybourne Hotel Group's portfolio with the addition of a luxury hotel in California.  At that time, Sheikh Hamad bin Khalifa identified a hotel then known as the Montage Beverly Hills to add to the Maybourne Hotel Group's collection.  Sheikh Hamad bin Khalifa enlisted the aid of Marc Socker, Michele Faissola, and his daughter and right-hand operative for his hotel investments, Sheikha Lulwah, to evaluate the opportunity.

82.   Accordingly, in June 2019, Mr. Socker contacted Mr. McKillen to request that he and Mr. Cunningham carry out a financing analysis surrounding the potential acquisition of the Montage Beverly Hills.  This was a sensible request, given Mr. McKillen's relationship with the Qatari Royals and the fact that his family has had a house in Los Angeles for over thirty years, during which time Mr. McKillen has been involved in multiple redevelopment projects there.  Mr. Socker told Mr. McKillen that Ohana Real Estate, owners of the Montage Beverly Hills, had expressed interest in providing Maybourne Hotel Group with an opportunity to bid for the hotel, alongside other bidders.  According to Mr. Socker, a key reason behind Ohana's extending this opportunity to Maybourne Hotel Group was Mr. McKillen's personal relationship with Ohana's CEO, Chris Smith.

83.   In the summer of 2019, Mr. Faissola, acting on behalf of Sheikh Hamad bin Khalifa and Sheikha Lulwah, reached out to Mr. McKillen to relay that Sheikha Lulwah would approve her father's purchase of the Montage Beverly Hills only on the condition that Mr. McKillen affirmed that the purchase price accurately reflected the hotel's value *and* that Mr. McKillen and HSMC would oversee the redevelopment and management of the hotel (the "Maybourne Beverly Hills Project").  Mr. McKillen proceeded in keeping with their business relationship and affirmed to Sheikha Lulwah via telephone call that the California

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

property was a good investment opportunity and that he and his team would manage and redevelop the new hotel upon purchase.

84. On August 22, 2019, Mr. Socker emailed Mr. Cunningham to inform him that the Maybourne Hotel Group had been awarded exclusivity in connection with the acquisition of the Montage Beverly Hills two days earlier, and singled out "relationships (including Paddy's with Chris Smith)" as a key factor supporting their success. Mr. Socker then made clear that Mr. McKillen and his team were expected to be responsible for operational due diligence and formulating a business and renovation plan.

85. So important was Mr. McKillen's assessment of the hotel and his vision for its redevelopment that Sheikh Hamad bin Khalifa wanted to hear about it for himself. In October 2019, Mr. McKillen flew to Doha, Qatar for a face-to-face meeting held on October 9th with Sheikh Hamad bin Khalifa, Sheikha Lulwah, Mr. Faissola, and Mr. Socker on the Sheikh Hamad bin Khalifa's yacht to discuss the opportunity in California. There, Mr. McKillen presented the vision for the hotel to Sheikh Hamad bin Khalifa. Mr. McKillen confirmed to Sheikh Hamad bin Khalifa his views on the opportunity presented by the hotel and gave his commitment to manage and strategically redevelop the hotel in California. In reliance on said commitment, Sheikh Hamad bin Khalifa allowed the acquisition to proceed.

86. Through these various dealings, the Qatari Royals engaged Mr. McKillen on the Maybourne Beverly Hills Project under the pretense of an ordinary course extension of a pre-existing business relationship, complete with compensation for annual hotel and project management fees.

87. And at the time of the engagement, the Qatari Royals *knew* that Mr. McKillen believed his acceptance to be premised upon receiving fees in exchange for services provided, as had been the practice for prior hotel and project management services Mr. McKillen and HSMC provided outside of the above

27

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

schemes.  The Qatari Royals gave no indication that the Maybourne Beverly Hills Project would be any different.  Further, the Qatari Royals understood that Mr. McKillen would not agree to expend the vast resources required for a project of such size without fair compensation.

88.    What is more, later that month, on October 16, 2019, Mr. McKillen, Mr. Cunningham, Mr. Socker, and Mr. Faissola met the outgoing management team of the Montage Beverly Hills at the Berkeley Hotel in London.[12]  There, on behalf of the Qatari Royals, Mr. Faissola and Mr. Socker explained that HSMC would replace the outgoing management team and manage and operate the hotel as the Maybourne Beverly Hills going forward.  After this meeting, and on behalf of Sheikh Hamad bin Khalifa, Mr. Faissola confirmed to Mr. McKillen that HSMC would be compensated with fees paid for work performed on the Maybourne Beverly Hills.

89.    Given now-explicit assurances of compensation coupled with their years-long business relationship in which he had been compensated for work performed, Mr. McKillen had every reason to believe he would be paid.  However, at some time during the course of the agreement, the Qatari Royals decided that they had no intention of compensating Mr. McKillen for his services on the Maybourne Beverly Hills, but fraudulently induced him to continue his services.  Indeed, the Qatari Royals had, under the promise and pretense of compensation, solicited Plaintiffs, a foreign individual and company, to perform additional work in the United States under materially false pretenses.

90.    On December 20, 2019, the Qatari Royals purchased the Montage Beverly Hills via Beverly Hills Acquisition LLC, a holding company ultimately

---

[12] During the time of the redevelopment of the Maybourne Beverly Hills, Mr. Faissola was the subject of criminal proceedings in Italy for alleged wrongdoing during his tenure at Deutsche Bank and therefore could not travel himself to the United States.

owned by Sheikh Hamad bin Khalifa, as direct owner and operator. The former Montage Beverly Hills was then renamed the Maybourne Beverly Hills. Shortly thereafter, on January 19, 2020, upon landing in Los Angeles, Mr. McKillen reached out to Sheikh Hamad bin Jassim via WhatsApp to discuss the Maybourne Beverly Hills project. Mr. McKillen wrote, "I arrived in LA for a few days and thought I'd let you know in case you are here for a chat and update." Sheikh Hamad bin Jassim responded, re-affirming the Qatari Royals' intention to have Mr. McKillen lead the redevelopment of the Maybourne Beverly Hills, saying, "Unfortunately I am in Doha ... when you are going to take over the hotel in L.A?"

91.    Accordingly, over the next two years, Mr. McKillen and his team undertook a massive redevelopment effort for the benefit of the Qatari Royals. First, from January to May 2020, Mr. McKillen and his team transitioned the hotel to the Maybourne brand. Then, from May 2020 until January 2022, they led the hotel's overall strategic development and management. Over this time, Mr. McKillen not only ensured that the Maybourne Beverly Hills was transformed into a first-rate hotel, but also kept the Maybourne Beverly Hills operational during the redevelopment. The work HSMC performed during this period was wide-ranging and ensured that the Maybourne Beverly Hills was brought up to the highest standards of luxury.

92.    Mr. McKillen and HSMC's work included, but was not limited to, effecting the rebranding of the hotel from the Montage Beverly Hills to the Maybourne Beverly Hills, budgeting capital expenditures for significant improvements, designing and overseeing redevelopment of guest suites and rooms and common areas, designing and overseeing redevelopment of new food and beverage spaces, designing a plan to relocate the hotel's kitchen to facilitate these new spaces, preparing landscaping plans and a parking layout, developing plans for the hotel's entrance and shops and galleries, preparing a significant plan

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

to add three new stories to the hotel, attracting top artists, meeting with staff, full-time residents, travel agents, and potential guests, and navigating local Beverly Hills planning and permitting requirements related to the redevelopment, all while managing the day-to-day operations of the Maybourne Beverly Hills.

93.    A project of this size required Mr. McKillen to be regularly engaged on-site in California.  Mr. McKillen secured a special travel exemption to travel to and work in California during the COVID-19 pandemic to oversee the redevelopment of the Maybourne Beverly Hills.[13]  Further, HSMC's agents were themselves on-site in Beverly Hills to manage the redevelopment virtually every day.  Thus, the Qatari Royals furthered the California Fraud through frequent phone communications terminating in California between the Qatari Royals and/or their agents, on the one hand, and Plaintiffs and/or their agents, on the other.

94.    And the Qatari Royals communicated frequently with Plaintiffs throughout the project.  For instance, on August 17, 2020, Mr. McKillen updated Sheikh Hamad bin Jassim via WhatsApp, "I was in LA to open our new Maybourne Beverly Hills. It went very well. Locals love us already. Very successful."  The Qatari Royals were not only aware of the ongoing work, but also regularly engaged with Mr. McKillen and his team throughout the process to ensure that they accrued the maximum benefit from this work.  Indeed, the Qatari Royals, through Sheikha Lulwah, Mr. Socker and Mr. Faissola, continually made requests of Mr. McKillen, regularly approved his work, and

---

[13] Specifically, Mr. McKillen traveled to Los Angeles during the following dates: September 13th to 16th, 2019, November 4th to 11th, 2019, December 15th to 17th, 2019, January 19th to 21st, 2020, August 10th to 16th, 2020, October 26th to November 1st, 2020, February 16th to 21st, 2021, March 10th to 17th, 2021, April 20th to 30th, 2021, July 8th to 16th, 2021, September 29th to October 1st, 2021, November 11th to 21st, 2021, and December 30th, 2021 to January 9th, 2022.

encouraged continued efforts throughout the redevelopment process, often emphasizing the value they placed on Mr. McKillen and his services.

95.    As an example, on November 4, 2020, Mr. McKillen sent Sheikha Lulwah a text message informing her that the new guestrooms at the Maybourne Beverly Hills would be complete in February or March 2021.  Sheikha Lulwah asked when the redevelopment on the Maybourne Beverly Hills had begun, and Mr. McKillen provided an update on Plaintiffs' ongoing work on the redevelopment of the hotel's guestrooms, lobby, and dining options.   Mr. McKillen assured Sheikha Lulwah that he and his team would build the Maybourne Beverly Hills's food and beverage offerings "to be a destination." Sheikha Lulwah echoed this sentiment and agreed that Mr. McKillen would "be able to add significant improvements" to the dining and beverage options at the Maybourne Beverly Hills.

96.    Further, on March 8, 2021, while Mr. McKillen was in California, he sent Mr. Faissola a text message stating that a new restaurant at the Maybourne Beverly Hills was the "hottest in [town]."  Mr. Faissola emphasized the value Mr. McKillen provided to the Qatari Royals through the project, responding that "there is no competition given location and management.  Before it was poorly managed.   They simply did not understand the business."   Mr. McKillen responded, "We'll make it No 1 hotel in North America."   Mr. Faissola responded, "Agreed!!!"

97.    And on April 15, 2021, Mr. McKillen texted Mr. Socker, who directed and approved his work, concerning the level of detail required for the budget on the Maybourne Beverly Hills's new food and beverage offerings. Specifically, Mr. McKillen asked Mr. Socker if a "pretty accurate" square footage estimate would suffice at the time, as it was "too early to give a 100 percent accurate quote."  Mr. Socker told Mr. McKillen that it was important to receive the budget the next day, but that an estimate would be fine.   Mr. Socker

concluded, "Thanks Paddy . . . Appreciate the efforts." Mr. McKillen responded, "No problem. We'll work on it till dawn if necessary."

98.    In addition to frequent engagement with the Qatari Royals and their agents via text message, Mr. McKillen also personally met with Sheikh Hamad bin Jassim in Los Angeles to discuss the various hotel projects, including the Maybourne Beverly Hills, as arranged via WhatsApp communications between the parties.

99.    On February 17, 2021, while located in Los Angeles, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp to arrange a meeting to discuss various hotel projects. He said, "I'm in LA but will leave on Sunday. Can you roughly let me know when you plan your trip here and I'll come back for a day." Sheikh Hamad bin Jassim responded, "I will be from the 2nd or 3rd of March for 17 days in L.A[.] so u [sic] can chose the time and I will be happy to see you any time that suits you." Mr. McKillen and Sheikh Hamad bin Jassim then agreed to meet on March 10th or 11th.

100.    On March 2, 2021, Mr. McKillen messaged Sheikh Hamad bin Jassim to confirm their meeting concerning the various hotel projects, saying, in relevant part, "I'm back in London now but available to go to LA to see you if it still suits you. You mentioned 10th or 11th. Is there a day and time you prefer? It would be great if we got a few hours to agree [on] the future for the hotels and our business partnership going forward." Sheikh Hamad bin Jassim responded, "Yes I am in the plane now flying to LA. 10th and 11th both work for me, I will be happy to discuss our future relationship."

101.    A few days later, on March 9th, Sheikh Hamad bin Jassim, then having arrived in Los Angeles, left Mr. McKillen a voice note seeking to meet to discuss the ongoing hotel projects, including the Maybourne Beverly Hills. Sheikh Hamad bin Jassim said, in relevant part, "Um, can we, eh, have lunch

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

together in my house [in Beverly Hills] at 12 o'clock on the 11th?" Mr. McKillen responded, in relevant part, "Perfect Boss. See you then."

102.    Over the course of the redevelopment, it is clear that Mr. McKillen provided an immense benefit to the Qatari Royals from a commensurate amount of work.   For instance, Mr. McKillen invited many well-known friends and celebrities who supported the hotel.   Mr. McKillen ultimately reinvigorated the property and transformed the hotel into not only a top luxury hotel in Beverly Hills, but also a world-class establishment.   Mr. McKillen's efforts to transform the Maybourne Beverly Hills did not go unnoticed and received extensive praise and acclaim in the media.   Media outlets praised the "sophisticated, old-school luxury"[14] throughout the redeveloped hotel, from the "opulence commingl[ing] with a breezy coastal vibe in the newly refurbished lobby" to the hotel's "world-renowned dining and culinary collaborations[.]"[15]   And during this period Mr. McKillen received no indication that anything had changed with respect to his business relationship with the Qatari Royals, compensation-related or otherwise.

103.    Indeed, on April 24, 2021, while Mr. McKillen was in Los Angeles, Mr. McKillen messaged Sheikh Hamad bin Jassim, "Congratulations today on our 6 year anniversary of signing our partnership."   Sheikh Hamad bin Jassim responded, "Thank u [sic] my friend ,and [sic] thank u [sic] for the good work and I hope we will continue our relation for a long time."

104.    By June 2021, Mr. McKillen was actively attempting to secure compensation by way of fees for services rendered.   But, according to plan, the Qatari Royals, themselves and through their representatives, engaged in a variety

---

[14]  Krista Simmons, Review of Maybourne Beverly Hills, CONDÉ NAST TRAVELER,              https://www.cntraveler.com/hotels/united-states/beverly-hills/montage-beverly-hills (last visited Nov. 14, 2024).

[15] Felicity Carter, *Take A First Look At The Ultra-Luxurious Maybourne Beverly Hills Hotel*,         FORBES         (May         30,         2020), https://www.forbes.com/sites/felicitycarter/2020/05/30/take-a-first-look-at-the-ultra-luxurious-maybourne-beverly-hills-hotel/?sh=66e7a0813828.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

of tactics to ward off Mr. McKillen's requests for payment: lulling Mr. McKillen into believing that he would be paid for his work before declining to effectuate payment at the last minute, stonewalling Mr. McKillen rather than engaging with his requests, and eventually outright denying payment.

105. On June 29, 2021, Mr. McKillen met with Mr. Faissola at The Connaught in London, where he attempted to discuss specifics of a fee arrangement for the Maybourne Beverly Hills project. Mr. Faissola, acting as though he was proceeding in good faith, instructed Mr. McKillen to put his fee proposal in writing.

106. Mr. McKillen did so and on July 1, 2021 transmitted his fee proposal to Mr. Faissola via letter. Therein Mr. McKillen stated that HSMC was owed $6 million in project management fees on an annual basis, to be paid quarterly, from January 2020 to January 2025. Mr. McKillen reasoned that "given what [HSMC] had already delivered this fee should begin from January 2020 . . . when the real work began with multiple meetings and interaction with City Authorities and building relationships with the city in order to get them aligned on the redevelopment of the project." Mr. McKillen's proposal was met with stonewalling by the Qatari Royals. Mr. Faissola never responded to Mr. McKillen's July 1, 2021 fee proposal letter.

107. In September 2021, Mr. McKillen again asked Mr. Faissola about payment of fees. Despite Mr. McKillen's regular communications with Mr. Faissola over the preceding twenty months, Mr. Faissola refused to pay Mr. McKillen for the work performed.

108. Believing this to be a misunderstanding, Mr. McKillen elected to speak with the Qatari Royals directly. Mr. McKillen first reached out to Sheikha Lulwah to request payment of fees. Sheikha Lulwah informed Mr. McKillen that Mr. Faissola acted in a representative capacity on behalf of her family, and thus spoke on behalf of Sheikh Hamad bin Khalifa and herself when he indicated to

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

34

Mr. McKillen that he would not receive payment of fees for the Maybourne Beverly Hills Project.

109.   Despite discussions concerning payment becoming tense, Mr. McKillen continued to provide services for the Qatari Royals' benefit in good faith, and the Qatari Royals knew that Mr. McKillen and HSMC continued to work diligently on the project, as evident from WhatsApp communications.

110.   On September 14, 2021, Mr. McKillen messaged Sheikh Hamad bin Jassim via WhatsApp concerning his team's progress on the Maybourne Beverly Hills, and Sheikh Hamad bin Jassim continued to affirm Mr. McKillen's work for the Qatari Royals' benefit.  Mr. McKillen wrote, in relevant part, "FYI I'll be in LA from 28 till 7 th [sic] October to present our new Maybourne Beverly Hills project to the City Council. Just to let you know I won't be in London during these days."  Sheikh Hamad bin Jassim responded, "Well, good luck Paddy and I hope we see you soon either in Doha or in London. Thank you."

111.   And on November 15, 2021, Sheikh Hamad bin Jassim left Mr. McKillen a voice note via WhatsApp to schedule a meeting with Mr. McKillen in Los Angeles the following day to discuss ongoing hotel projects.  He said, in relevant part, "Paddy how about we meet afternoon late in the, in the Maybourne hotel [in Beverly Hills]?"  Mr. McKillen, then located in California, responded, in relevant part, "Sadly I'll be in San Francisco on Wednesday till 8 pm I'm here tomorrow Tuesday and then Thursday till Sunday. Is there any other time that suits you please?"  The two then continued to exchange voice notes concerning scheduling.  Sheikh Hamad bin Jassim later asked, via voice note, "Are you available today around 4:30 between 4:30 and 5 to come to the house [in Beverly Hills] we'll have a cup of coffee together."  Mr. McKillen responded, "Yes I can make it at 4 this afternoon absolutely. See you at your home."  Sheikh Hamad bin Jassim said, via voice note, "Okay 4:30 I am waiting for you Paddy, thank you."  Sheikh Hamad bin Jassim solicited Mr. McKillen for this meeting in

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

California, in part, to discuss Mr. McKillen's management of projects including the Maybourne Beverly Hills.

112. Nonetheless, Mr. McKillen continued to be unsuccessful in obtaining fees from the Qatari Royals. On November 22, 2021, Mr. McKillen's assistant asked Mr. Faissola and Mr. Socker to pass on a letter to Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim authored by Mr. McKillen detailing the work he and his team had performed in California. Mr. McKillen emphasized that, as the Qatari Royals already knew, Mr. McKillen and HSMC had "managed the new hotel in Beverly Hills for 2 years" and "created hundreds of improvements both physically and operationally to bring [the Hotel] up to the highest standards of luxury in North America." Mr. McKillen highlighted his team's extensive efforts to obtain necessary permitting and approvals for the expansion of the Maybourne Beverly Hills, which included meetings with the Mayor of Beverly Hills, the City Manager of Beverly Hills, and members of the Beverly Hills City Council. Mr. McKillen explained to Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim that Sheikh Hamad bin Khalifa's representatives had refused to pay him fees owed. Mr. McKillen informed the Qatari Royals that he could not let his injury in California continue to accrue by extending the duration of his providing services for which he was not receiving payment. Accordingly, Mr. McKillen stated that he was forced to "withdraw [his] energies and the efforts of [his] people from the Beverly Hills Project" and "hand over [the] project in a professional and safe fashion" to Sheikh Hamad bin Khalifa's representatives.

113. Sheikh Hamad bin Khalifa responded to Mr. McKillen's earnest demands by making clear that Mr. McKillen's role in the redevelopment and management of the Maybourne Beverly Hills had come to an end. On December 2, 2021, Sheikh Hamad bin Khalifa sent Mr. McKillen a brief response letter that did not dispute any of Mr. McKillen's claims but ignored his demand for

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

payment.[16]  Rather, Sheikh Hamad bin Khalifa thanked Mr. McKillen for "all [of his] efforts and hard work over the past 7 years in developing and managing the Maybourne Group's hotels" and asked that Mr. McKillen ensure "that over the coming weeks and months a professional transition of management is coordinated with Michele [Faissola] and his team to ensure that the hotels continue to function properly to the best of their potential in the short and medium term."

114.  Despite the seeming finality of the Qatari Royals' response in this letter, they continued to string Mr. McKillen along by lulling him into believing that he *might* be compensated—and that they were not running off with free services as part of a coordinated, global effort.

115.  In February 2022, Mr. McKillen met with Sheikh Hamad bin Jassim at The Berkeley in London in another attempt to secure compensation by way of fees for his work.  Like Mr. Faissola, upon Mr. McKillen's first request for fees, Sheikh Hamad bin Jassim presented to Mr. McKillen as though he was acting in good faith and agreed with Mr. McKillen that HSMC was owed fees for work on the Maybourne Beverly Hills.  Sheikh Hamad bin Jassim went so far as to ask Mr. McKillen to send him invoices so that he could get them paid, despite having no intention to effectuate payment.

116.  For a short time, the Qatari Royals' attempt to lull Mr. McKillen into believing he would be paid was successful.  Thinking that he had reached a breakthrough, Mr. McKillen provided invoices to Sheikh Hamad bin Jassim for $6 million in hotel management fees and $12 million in project management fees for work performed in California in 2020 and 2021.  Mr. McKillen proceeded in

---

[16] This letter was sent to Mr. McKillen's secretary, Annemarie Ryan, from Mahmoud Raafat of Dilmon via email.  The email was sent to Ms. Ryan from Mr. Raafat's "dilmon.com" email address.  Upon information and belief, the dilmon.com domain is registered on an Amazon server routed through Princeton, New Jersey.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

good faith.  The invoices reflected amounts consistent with industry standards and the fair market value of HSMC's services.

117. Still unsuccessful in obtaining fees, on January 7, 2022, while Mr. McKillen was in Los Angeles, he messaged Sheikh Hamad bin Jassim concerning the nonpayment.  Mr. McKillen wrote, in relevant part, "Just an FYI to let you know that Dilmon supported by His Highness [Sheikh Hamad bin Khalifa] have formally told me they won't pay either my project management fees for rebranding and the restructuring of the BH hotel over the 30 months nor for the hotel management. This is a bizarre and ill conceived [sic] decision as the hotel has jumped in value and [is] loved by the City officials and community. I am further astonished that HH [Sheikh Hamad bin Khalifa] flatly refused to meet with me. Any light you can throw on this sad and unpleasant situation I would appreciate as it clearly impacts the general relationship and smooth running of the group. I am vacating the maybourne BH hotel today."  Sheikh Hamad bin Jassim responded, "Hi Paddy, thank you for informing me. I am not aware of the details of your arrangements with Dilmon. However I will speak with them and try to find out about their thinking. I plan to be in London by the end of the month and hope to see you there. With my best regards. HBJ."

118. Unfortunately, it soon became clear that Sheikh Hamad bin Jassim thereby only furthered the California Fraud by lulling Mr. McKillen into a sense of security, concealing the true intent of the Qatari Royals, and, ultimately, refusing to effect payment in keeping with the united front of the Qatari Royals, their agents and representatives, and their controlled entities.

119. Despite exhaustion after months of back-and-forth with the Qatari Royals in which he had made no gains, Mr. McKillen made a final attempt to secure payment.  In early 2022, Mr. McKillen wrote to the Board of Directors of Maybourne Hotels Limited concerning nonpayment of fees.  Mr. McKillen again recounted the considerable work he and his team had performed to redevelop the

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA  90067
310-855-3000

Maybourne Beverly Hills and expressed shock that Sheikh Hamad bin Khalifa's representatives continually refused to pay fees owed for the work.

120. On February 3, 2022, Mr. McKillen received a response via letter on behalf of the Board of Directors of Maybourne Hotels Limited. The letter did not address or dispute any of Mr. McKillen's points. Rather, the letter informed Mr. McKillen, "[w]e are considering the points you raised in [your] letter and will respond as may be necessary." The Board of Directors of Maybourne Hotels Limited once again presented to Mr. McKillen in good faith, suggesting that resolution of Mr. McKillen's concerns may be imminent when, in fact, the Qatari Royals had no intention to address Mr. McKillen's concerns. Indeed, no response was ever provided nor payment ever received.

121. To date, years after Mr. McKillen's first request, the Qatari Royals, their agents and representatives, and controlled entities have refused to pay Mr. McKillen or HSMC any fees whatsoever for two years of work on the Maybourne Beverly Hills. And it is now clear that the Qatari Royals have no intent to compensate him.

122. As described *supra*, the Qatari Royals furthered the California Fraud through frequent phone communications terminating in California between the Qatari Royals and/or their agents and Plaintiffs and/or their agents. Further, throughout the California Fraud, Sheikh Hamad bin Khalifa and Dilmon utilized an email server located in the United States through which they routed their emails to further the California Fraud via, for example, denying Mr. McKillen payment for services.

## THE NEW YORK FRAUD

123. The Qatari Royals' fraud against Plaintiffs was not limited to the sphere of their hotel investments. Rather, they also saw—and took— opportunities to take advantage of Plaintiffs' good faith and fraudulently enrich

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

themselves with respect to their personal property as well. Accordingly, a five-story Manhattan mansion was the object of the Qatari Royals' fourth fraud.

124. In June 2012, Tower Management, a company beneficially owned by Sheikh Hamad bin Jassim, purchased a five-story mansion in Manhattan spanning over 22,000 square feet (the "Jassim Residence") for $47 million. Following purchase, Sheikh Hamad bin Jassim ordered an extensive, multi-year refurbishment of the property (the "New York Project"), which required converting the building from commercial to residential use. Initially, Uberto Construction ("Uberto") served as the primary contractor on the refurbishment and was overseen and managed by Qaya, an entity created for the provision of services to Sheikh Hamad bin Jassim by his agents. Karin Cooper led the project at Qaya.

125. In 2018—around the same time as the other schemes against Plaintiffs were getting underway—Sheikh Hamad bin Jassim realized that the refurbishment of the Jassim Residence was getting nowhere. Indeed, at that time, the New York Project was extremely behind schedule and had encountered numerous difficulties, construction-related and otherwise.

126. Sheikh Hamad bin Jassim then turned to Mr. McKillen and HSMC, who he knew were experienced project managers in the ultra-luxury property refurbishment space, as described *supra*. Accordingly, Sheikh Hamad bin Jassim approached Plaintiffs to engage HSMC to take over management of the New York Project. Sheikh Hamad bin Jassim made clear to Plaintiffs that the goal of the refurbishment was to allow him and his family to live in the Jassim Residence in an environment reflecting the highest standards of luxury.

127. As, at this point, Mr. McKillen still believed that he had a productive business relationship with the Qatari Royals, Plaintiffs accepted the engagement on the premise, of course, that HSMC would be compensated for work performed based on past dealings in which this had been the case and the magnitude of labor

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

1    required to refurbish a 22,000 square foot residence.  And the Qatari Royals knew

2    that Plaintiffs accepted the engagement on the premise that they would be

3    compensated for the fair value of their services.

4    128.    HSMC assigned its associate Jim Byrne to manage the New York

5    Project.  Mr. Byrne had previously successfully managed the refurbishment of

6    Sheikh Hamad bin Jassim's personal residence in London, and Sheikh Hamad

7    bin Jassim trusted him and HSMC to get the job done again.

8    129.    However, in line with the pattern under the other three schemes, the

9    Qatari Royals decided that they had no intention of compensating HSMC for

10   services performed for their own enrichment, including on the New York Project,

11   but fraudulently induced him to continue providing services under the pretense

12   of compensation, thereby soliciting HSMC, a foreign company, to perform

13   additional work in the United States under materially false pretenses.

14   130.    From September to December 2018, Mr. Byrne, on behalf of

15   HSMC, dedicated over 950 hours to management of the New York Project in

16   New York.    During this time, Mr. Byrne oversaw contractors, addressed

17   construction damage, and ensured proper operation of luxury features installed

18   in the Jassim Residence.  He attended to acoustics, insurance matters, plumbing

19   issues, roofing, in-home gym features, and the resolution of city code violations.

20   He oversaw work relating to the façade, finishings, steam room, elevator,

21   dumbwaiter, plunge pool, painting, tiling, safety systems, hanging of fine art, and

22   (even) disputes between Qaya and Uberto.  And in September 2018, HSMC had

23   to personally arrange for one of its New York contacts to pay a $13,700 deposit

24   to an energy provider to turn on the gas supply at the Jassim Residence.

25   131.    Once it was feasible, Mr. Byrne even moved into the Jassim

26   Residence to rigorously evaluate its suitability for Sheikh Hamad bin Jassim and

27   his family, identifying and fixing any outstanding issues and providing ongoing

28   management services.  HSMC, via Mr. Byrne, thus ensured that the work done

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA  90067
310-855-3000

41

in the Jassim Residence was in accordance with Sheikh Hamad bin Jassim's ultra-luxury standards.

132.    On November 15, 2019, the Jassim Residence received its certificate of occupancy, and Sheikh Hamad bin Jassim realized the fruits of HSMC's labor. But despite HSMC's around-the-clock work on the New York Project for the benefit of Sheikh Hamad bin Jassim, aside from reimbursement for some one-off expenses, the Qatari Royals have since squarely refused to pay HSMC any more than a single, nominal payment of €20,000 for work performed on the Jassim Residence.  To this day, no other payments have been made to HSMC—or Mr. Byrne—for over 950 hours of labor, despite the millions of dollars of appreciation in the value of the Jassim Residence as a direct result thereof, in line with the pattern adopted as part of the Qatari Royals' broader scheme against Plaintiffs.

133.    On information and belief, the Qatari Royals furthered the New York Fraud through frequent email and phone communications terminating in New York between the Qatari Royals and/or their agents and Plaintiffs and/or their agents.

## THE QUINTET SCHEME

134.    Mr. McKillen's efforts at collecting on the payments he is owed, described *supra*, have only been met with retaliation and additional bad faith business practices by the Qatari Royals.  Most recently, the Qatari Royals used Quintet—a bank beneficially owned by Sheikh Hamad bin Jassim[17] and used as a regular financial intermediary to service the Qatari Royals' private interests[18]—

---

[17] Quintet is 99.99% owned by Qatari company Precision Capital LLC.  On information and belief, Precision Capital LLC is beneficially owned by Sheikh Hamad bin Jassim.

[18] For instance, since at least 2018, reports indicate that Quintet has granted a number of significant commercial loans to its shareholder and beneficial owner, Pioneer Holding, a company whose beneficial owner is Sheikh Hamad bin Jassim.  These loans demonstrate Sheikh Hamad bin Jassim's use of Quintet to

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

to attempt to wrongfully intimidate (and squeeze) Mr. McKillen into dropping his efforts to obtain fees rightfully owed to him and his companies by interfering with their efforts to refinance a large loan, resulting in a costly default.

135.   As background, on July 30, 2021, Quintet, in its capacity as a credit institution, entered into a loan agreement for a principal sum of €18,830,000 (the "Loan") with Loendro Finacement S.à r.l. ("Loendro") as "Borrower" and Mr. McKillen as "Guarantor" (the "Loan Agreement").  Loendro is a Luxembourg limited liability company of which Plaintiff McKillen is the sole shareholder.

136.   At the beginning of August 2023, Loendro informed Quintet that it intended to accept an offer from another institution, Indosuez Bank, to refinance the Loan on more favorable terms.  But in response, Quintet approached Loendro with a highly favorable counteroffer to refinance the terms of the Loan Agreement (the "Refinancing Offer").  On information and belief, Quintet made the Refinancing Offer at the direction of Sheikh Hamad bin Jassim as beneficial owner (the "Quintet Scheme").

137.   As a result of the favorable terms of the Refinancing Offer and the parties' pre-existing relationship, Loendro agreed with Quintet to cease the negotiation process over refinancing with Indosuez Bank in exchange for accepting Quintet's Refinancing Offer.  Shortly thereafter, Quintet informed Loendro that the Refinancing Offer had been validated internally.

138.   But after weeks of an accelerated negotiation process between Quintet and Loendro, on September 8, 2023, Quintet abruptly informed Loendro that it was retracting and withdrawing the Refinancing Offer and would be enforcing the terms of the Loan Agreement immediately.  On information and belief, Quintet took such action at the direction of Sheikh Hamad bin Jassim as

advance his private interests and call into doubt the independence of Quintet and its shareholders, including Sheikh Hamad bin Jassim.

beneficial owner and did so in retaliation against Mr. McKillen for his efforts to obtain funds owed to him by the Qatari Royals and, more importantly, to attempt to force Mr. McKillen into dropping such efforts. Indeed, Quintet even went so far as to inform Loendro that the withdrawal of the Refinancing Offer was related to ongoing disputes between the entities' respective shareholders—i.e., Sheikh Hamad bin Jassim and Mr. McKillen.

139. The abrupt reversal left Loendro seriously prejudiced in its ability to seek alternative financing options, and, suspecting foul play, Loendro halted payments under the prior Loan Agreement. In response, on November 9, 2023—and as part of the Qatari Royals' effort to squeeze Mr. McKillen financially and to intimidate him into abandoning his attempts at recourse related to the above-described frauds—Quintet informed Loendro and Plaintiff McKillen that it was declaring them in default and terminating the Loan Agreement, while also demanding immediate repayment of the outstanding balance. On April 11, 2024, Quintet then issued a payment order equivalent to a property seizure on Plaintiff McKillen. And on May 14, 2024, Quintet sought to enforce Plaintiff McKillen's guarantee as security for the Loan Agreement in the amount of €13,857,220.64. Despite this pressure tactic, Mr. McKillen promptly repaid Quintet the full amount outstanding on the loan.

140. Quintet's abrupt retraction of the Refinancing Offer intentionally prejudiced Plaintiff McKillen as Loendro's sole shareholder by depriving Loendro of access to favorable market conditions and jeopardizing its refinancing project more broadly.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

141.    Communications between Quintet and Plaintiff McKillen and/or his agents through which the Qatari Royals furthered the Quintet Scheme were routed through an email server located in the United States.[19]

## ADDITIONAL RACKETEERING

142.    Although Mr. McKillen once believed the Qatari Royals sought to engage his and his company's services in good faith, he now understands that they instead made a calculated decision to defraud him, and that this was only part of a global pattern of illegal racketeering perpetrated by the Qatari Royals or any affiliated entities or individuals.  Indeed, for more than a decade, the Qatari Royals have grown their wealth and enhanced their geopolitical goals with little respect for the law or fair business dealings.  Some schemes bear striking similarities to the fraud perpetrated against Mr. McKillen.

143.    For example, the defrauding of Mr. McKillen for his services sounds in other schemes based in unpaid wages perpetrated by Qatar on workers during the FIFA World Cup in 2022 (the "World Cup").[20]  The Qatari Royals were, of course, involved in the World Cup.  Having been referred to by one news outlet as the "Sheikh who secured [the] World Cup for Qatar,"[21] Sheikh Hamad bin

---

[19] Correspondence between Plaintiff McKillen and/or his agents and Quintet was routed through an email address, the domain of which, chateau-la-coste.com, was registered to Network Solutions, LLC in Jacksonville, Florida at the time of correspondence.

[20] Pete Pattisson, *World Cup stadium workers 'had their money stolen and lives ruined', says rights group: Report on conditions in Qatar alleges labour abuses are widespread and calls on Fifa to set up compensation fund*, THE GUARDIAN (Nov. 10, 2022), https://www.theguardian.com/global-development/2022/nov/10/world-cup-stadium-workers-had-their-money-stolen-and-lives-ruined-says-rights-group.

[21] Rob Davies, *Sheikh who secured World Cup for Qatar has UK links going back decades*, THE GUARDIAN (Nov. 15, 2022), https://www.theguardian.com/news/2022/nov/15/sheikh-world-cup-qatar-uk-links-decades-hamad-bin-jassim-bin-jaber-al-thani.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

Jassim personally orchestrated Qatar's successful World Cup bid.[22]  And as Emir of Qatar at the time, Sheikh Hamad bin Khalifa was also instrumental to these efforts.[23]  His son, Sheikh Mohammed bin Hamad bin Khalifa Al Thani, served as the chairman of Qatar's bid committee.[24]

144.    Qatar's World Cup bid has now obtained widespread notoriety for allegations of corruption.  For instance, the Department of Justice has since found that representatives working for Qatar bribed FIFA officials to win the World Cup bid and indicted top FIFA officials.[25]  And, unsurprisingly, as the organizer of such an effort, Sheikh Hamad bin Jassim was later personally named in a complaint filed by anti-corruption organization Anticor in France on April 7, 2023, alleging corruption in connection with the awarding of the World Cup to Qatar, also involving former French president Nicolas Sarkozy.  The complaint

---

[22] *See* Josh Mone, *What Happened in Qatar?: Examining the Corruption Scandal Surrounding the 2022 World Cup*, MINN. J. OF INT'L L. BLOG (Mar. 17, 2023), https://minnjil.org/2023/03/17/what-happened-in-qatar-examining-the-corruption-scandal-surrounding-the-2022-world-cup/ ("In 2010, Sheikh Hamad bin Jassim al-Thani . . . traveled to France to pitch the almost fantastical idea of hosting the world's largest sporting event . . . . In the nearly thirteen years since then, [FIFA] and Qatari officials have faced countless scandals and accusations relating to the 2022 World Cup.").

[23] Jon Gambrell, *Qatar's World Cup opener shows its reemergence after boycott*, AP NEWS (Nov. 20, 2022), https://apnews.com/article/2022-world-cup-qatar-politics-8c7b494269449c56b4a4e2daec53fbc0 ("But the biggest applause came for Sheikh Tamim and his father, Sheikh Hamad bin Khalifa Al Thani, who secured the tournament back in 2010.").

[24] *The FIFA World Cup Qatar 2022: Turning a Vision into Reality*, STATE OF QATAR GOVERNMENT COMMUNICATIONS OFFICE, https://www.gco.gov.qa/en/fifa/our-journey/ (last visited Nov. 14, 2024).

[25] Tariq Panja & Kevin Draper, *U.S. Says FIFA Officials Were Bribed to Award World Cups to Russia and Qatar*, N.Y. TIMES (Apr. 6, 2020), https://www.nytimes.com/2020/04/06/sports/soccer/qatar-and-russia-bribery-world-cup-fifa.html#:~:text=After%20years%20of%20investigations%20and,World%20Cup%20in%20men's%20soccer.

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

alleged, among other offenses, active and passive trading in influence, active and passive corruption of a foreign public official, and criminal association.[26]

145.    After Qatar secured the World Cup bid—under Sheikh Hamad bin Khalifa and Sheikh Hamad bin Jassim's leadership—it has also been widely alleged that a company owned by the Al Thani family engaged to build several of the World Cup stadiums perpetuated and covered up labor abuses—such as wage theft—on workers it employed.    The Hamad bin Khalid Contracting Company (the "HBK Contracting Company"), owned by the Al Thani royal family, was implicated in a thorough, wide-ranging report published by Equidem, a labor rights organization, for a series of wage abuses—including wage theft and fraud—perpetrated on workers on FIFA World Cup stadiums in Qatar[27] during a similar time period as the wage theft perpetrated against Plaintiffs through the frauds described herein.    At least one publication has directly connected Sheikh Hamad bin Khalifa to these allegations.[28]

146.    World Cup workers stated, for example, that they did not receive promised wages from the HBK Contracting Company during the pandemic and

---

[26] Rémi Dupré & Samuel Laurent, *Corruption complaint filed against Sarkozy over Qatar World Cup awarding process*, LE MONDE (Apr. 25, 2023), https://www.lemonde.fr/en/politics/article/2023/04/25/corruption-complaint-filed-against-sarkozy-over-qatar-world-cup-attribution_6024289_5.html. Reporting also indicates that, in 2009, Sheikh Hamad bin Khalifa paid six million euros to former President Sarkozy's wife. *See The Raven Project Leaks: Qatar Reportedly Ordered Payment Of Six Million Euros To Wife Of French President Sarkozy In 2009*, MEMRI (Dec. 26, 2023), https://www.memri.org/reports/raven-project-leaks-qatar-reportedly-ordered-payment-six-million-euros-wife-french-president.

[27] *See "If we complain, we are fired:" Discrimination and Exploitation of Migrant Construction Workers on FIFA World Cup Qatar 2022 Stadium Sites*, EQUIDEM (2022), https://www.equidem.org/assets/downloads/Equidem_Qatar_World_Cup_Stadiums_Report_Final.pdf (the "Report").

[28] Avani Dias & Som Patidar, *Qatar royal family company accused of covering up migrants' exploitative working conditions ahead of FIFA World Cup*, AUSTRALIAN BROADCASTING CORPORATION (Nov. 9, 2022), https://www.abc.net.au/news/2022-11-10/fifa-world-cup-qatar-and-human-rights/101624010.

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

that, even before the pandemic, their salaries were not paid on time or, at other times, at all.[29]  Still other workers alleged that the HBK Contracting Company failed to comply with salary promises and systematically underpaid them what was promised.[30]  On top of these examples of fraud and wage theft, workers employed by the HBK Contracting Company also described working long days without overtime pay, non-payment of severance pay, and reimbursement for only a fraction of the amount of sizeable recruitment fees paid by workers.[31]  Hearkening back to the frauds described herein, as the Report puts it, "Wage theft is most visible in cases where workers *agree to particular terms of remuneration, complete the work, yet receive no payment*.  However, non-payment and underpayment of wages and severance in the range of forms described above all constitute wage theft" (emphasis added).[32]

147.   Aside from the World Cup, reporting to U.S. government agencies and media articles strongly suggest that the Qatari Royals' unlawful activities were to grow their wealth and enhance their geopolitical goals.

148.   For instance, the Qatari Royals have used Quintet as a financial intermediary to facilitate transactions that are, at a minimum, suspicious, if not outright fraudulent.  Between 2013 and 2017, at least a dozen transactions involving accounts opened in Quintet's books were flagged as suspicious by United States authorities under anti-money laundering rules and on the basis of suspicious activity reports filed by United States banks through which the transactions were processed.[33]

---

[29] Report at 51.

[30] *Id.* at 53-54, 57.

[31] *See id.* at 9, 53–56.

[32] *Id.* at 58.

[33] *See* Explore the FinCEN Files data, INTERNATIONAL CONSORTIUM OF INVESTIGATIVE JOURNALISTS, https://www.icij.org/investigations/fincen-

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

149.   The Qatari Royals also appear to have utilized Quintet to engage in a complex scheme to advance the family's luxury hotel investment interests while also hiding illicit activities.  In 2018, Sheikh Hamad bin Jassim engaged with U.S. real estate billionaire Ben Ashkenazy and Indian businessman Sabatra Roy related to Mr. Roy's sale of the Plaza Hotel (the "Plaza") to ensure the sale of the Plaza to a subsidiary of the Qatar Investment Authority ("QIA"), Qatar's sovereign wealth fund.  That transaction appears to have been set up to improperly benefit the Qatari Royals from misappropriated government funds while also hiding payments to Mr. Roy from Indian authorities.[34]

150.   Financial records of the deal show that Sheikh Hamad bin Jassim: (i) engaged Mr. Ashkenazy to act as Sheikh Hamad bin Jassim's proxy in the purchase of the Plaza to obscure his involvement in the deal; (ii) purchased the mortgages on the Plaza and one other hotel owned indirectly by Mr. Roy and subsequently sold them to Katara Hospitality, a subsidiary of the QIA, at an inflated price, utilizing KBL European Private Bankers, now known as Quintet; and (iii) effectuated the sale through, first, partnership with Mr. Ashkenazy to block legitimate bids for the hotel and, second, to make a disguised $20 million payment to Mr. Roy to ensure the Plaza was sold to a subsidiary of the QIA, all

files/explore-the-fincen-files-data/ (last visited Nov. 14, 2024); *see also* Adam Lusher, Panama Papers: 12 world leaders linked to offshore dealings - and the full allegations against them, THE INDEPENDENT, (April 5, 2015), https://www.the-independent.com/news/world/politics/panama-papers-assad-putin-poroshenko-mubarak-al-saud-pm-iceland-sigmundur-davio-gunnlaugsson-a6967411.html; Yann Philippin, The Secret History of Hamad al-Thani's Offshore Fortune, MEDIAPART (June 22, 2016), https://www.mediapart.fr/journal/international/220616/l-histoire-secrete-de-la-fortune-offshore-de-hamad-al-thani; Panama Papers – Mossack Fonseca, Yalis S.A., INTERNATIONAL CONSORTIUM OF INVESTIGATIVE JOURNALISTS, https://offshoreleaks.icij.org/nodes/10157956 (last visited Nov. 14, 2024).

[34] Sheikh Hamad bin Jassim previously served as the QIA's Chairman and Chief Executive Officer.

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

at a time when Mr. Roy was under close observation for criminal failure to pay off penalties to the Indian Government.

151.  More specifically, in June 2017, Mr. Ashkenazy acquired a minority equity position in the Plaza, which included a right of first refusal to any sale. The next month, Sheikh Hamad bin Jassim, through one of his companies, purchased the mortgages Mr. Roy's companies took out to finance the purchase of the Plaza and another New York hotel.  That day, Sheikh Hamad bin Jassim's company also provided almost $130 million in additional debt financing to Mr. Roy's companies, secured by the Plaza and another New York hotel (the "Roy Loan").  On information and belief, a significant portion of the funds used in this transaction were processed through an account at the bank now known as Quintet. In total, Sheikh Hamad bin Jassim paid almost $531 million for Mr. Roy's mortgages on the properties.

152.  As a mortgagee on the Plaza and through Mr. Ashkenazy's right of first refusal and ownership of these mortgages, Sheikh Hamad bin Jassim was able to control the sale of the Plaza and blocked legitimate bids.   These advantages, combined with his control over the QIA, allowed Sheikh Hamad bin Jassim to inflate the price at which the Plaza was sold to a subsidiary of the QIA—$600 million—such that he profited from the deal through his sale of his mortgage to Katara Hospitality, using an account at Quintet.  On the day of sale, July 2, 2018, public filings indicate that the mortgages he owned were released.

153.  What is more, according to public filings, the outstanding principal on the Roy Loan, now secured solely by another New York hotel, was $100 million at the time of the sale of the Plaza.  Following sale, this balance was then divided into two tranches: $80 million assigned from Sheikh Hamad bin Jassim's company to an affiliate of the QIA, and $20 million assigned to Salisbury Group Holdings LLC ("Salisbury"), affiliated with Mr. Roy.  On information and belief, Sheikh Hamad bin Jassim funneled this $20 million payment to Mr. Roy through

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA  90067
310-855-3000

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

Salisbury to ensure the sale of the Plaza to a subsidiary of the QIA after blocking other legitimate bids, structured in such a manner to conceal the funds from the Indian authorities closely monitoring the sale of Mr. Roy's overseas assets.

154.    As another example, the Qatari Royals' support of terrorist groups is now no secret.  Public reporting indicates that the Qatari Royals have provided material support to various terrorist organizations.  And the Qatari Royals have not kept silent about their support for such groups.

155.    Further, Michele Faissola, a member of the Qatari Royals' inner circle and key player in defrauding Mr. McKillen, has faced criminal inquiries of his own.  Faissola is a former Deutsche Bank executive who has worked as an advisor to the Al Thani family since January 2018 as Chief Executive Officer of Dilmon.

156.    Mr. Faissola was implicated in multiple criminal investigations during his time at Deutsche Bank.  While serving as Global Head of Rates, Mr. Faissola oversaw traders subsequently convicted of wire fraud due to their role in a long-running LIBOR-fixing scheme.  A preliminary report on the scandal published in 2015 by BaFin, Germany's financial regulator, stated that "there [was an] indication that Mr. Faissola could have known about the manipulations by DB trades in 2008" and that "he might have even supported the manipulations by making the request to trader[.]"[35]  A former trader later alleged that she even provided Mr. Faissola with a report illustrating evidence of market manipulation

---

[35] Letter from Frauke Menke, Department President, Federal Financial Supervisory Authority, to Deutsche Bank AG, Management Board (May 13, 2015) (draft convenience translation) at 2–3. https://graphics.wsj.com/documents/doc-cloud-embedder/?sidebar=0&_gl=1*6vn2eu*_gcl_au*MTQ2NTYyMjIwMC4xNzM4MDA5MDQw*_ga*MTc4NTc4MTY4Ni4xNzE2OTIwOTcy*_ga_K2H7B9JRSS*MTc0NDY3NTg0Ny4yOC4xLjE3NDQ2NzU5MTAuNjAuMC4w#2167237-deutsche.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

during her tenure at the Bank.[36]   Though the traders' convictions were later overturned, Deutsche Bank agreed to pay over €3.8 billion in fines and settlements to regulators in the United States and Europe.

157.   In May 2018, a Milan court convicted Mr. Faissola and others of market manipulation in one of the most high-profile European banking cases of the decade.   In January 2013, managers of Italian bank Monte dei Paschi di Siena SpA ("MPS") were accused of colluding with Deutsche Bank and Nomura bankers, including Mr. Faissola, following the financial crisis, to hide losses at MPS by using complex derivatives trades that misrepresented MPS's finances. Though this sentence was overturned on appeal, a second Italian court sentenced Mr. Faissola on the same charges in November 2019.   In May 2022, this second sentence was overturned on the basis of a challenge to the prosecutors' definition of the derivative trades used.

158.   Such a global and long-running spree of unlawful activity by the Qatari Royals and their associates, representing only *reported* instances, informs the broader context in which Mr. McKillen was victimized by bad actors.

## FIRST CLAIM FOR RELIEF
### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)
(Against All Defendants)

159.   Plaintiffs reallege and incorporate herein each and every allegation set forth in Paragraphs 1 through 158 as if fully set forth herein.

160.   Patrick McKillen and Hume Street Management Consultants Limited are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c), as they are each capable of holding a legal or beneficial interest in property.

---

[36] Caroline Binham, *Trader caught up in Libor scandal sues Deutsche Bank*, FINANCIAL TIMES (Oct. 26, 2015), https://www.ft.com/content/2204ac3c-740e-11e5-bdb1-e6e4767162cc.

161.   Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Beverly Hills Acquisition LLC, and Maybourne Hotels Limited are each a "person" under 18 United States Code Sections 1961(3) and 1962(c), as they are each capable of holding a legal or beneficial interest in property.

162.   Defendants Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Beverly Hills Acquisition LLC, and Maybourne Hotels Limited, and each of their agents and representatives, along with non-defendant enterprise members SEDHV, Gilles de Boissieu, Constellation Paris, and Fady Bakhos, constitute an "enterprise" engaged in, and the activities of which affect, interstate and foreign commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Al Thani Enterprise").   The Al Thani Enterprise is an informal association operating for a common purpose on an ongoing basis.   To further this purpose, the Al Thani Enterprise has engaged in coordinated activity to perpetrate a series of fraudulent schemes against Mr. McKillen by fraudulently inducing and soliciting Plaintiffs, a foreign individual and foreign company, to continue to provide services in the United States on ultra-luxury property projects under the false pretense of compensation for services rendered, while having no intention to compensate them, and later refusing to compensate them once a benefit to the Qatari Royals had been realized.

163.   As members of the Al Thani Enterprise, each Defendant was and remains associated with the Al Thani Enterprise and has conducted and/or participated in the management and operation of the affairs of the Al Thani Enterprise in relation to Plaintiffs through a pattern of unlawful activity implicated under 18 U.S.C. § 1961(1)(B), including multiple, related, repeated, and continuous acts of wire fraud and fraud in foreign labor contracting chargeable under §§ 1343 and 1351, respectively.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

164.   At all times relevant herein, Defendants have each carried out and participated in schemes to defraud Plaintiffs through the Al Thani Enterprise. Defendants' conduct includes, though is not limited to:

a.   Inducing and soliciting Plaintiffs, a foreign individual and foreign company, to continue to provide management and/or redevelopment services in the United States in support of the Qatari Royals' investments on the materially false pretense and/or via materially false representations that Plaintiff would be compensated for services performed, when in truth Defendants did not intend to fully compensate Plaintiffs for services performed;

b.   Making materially false representations that Plaintiffs would be compensated for services performed;

c.   Directing and/or approving Plaintiffs' work on each of these management and/or redevelopment projects for the Qatari Royals' benefit with knowledge that the Qatari Royals did not intend to compensate Plaintiffs and in furtherance of the fraudulent schemes;

d.   Engaging in dilatory tactics to conceal the Qatari Royals' true intent from Plaintiffs and luring Plaintiffs into believing that the Qatari Royals would compensate them; and

e.   Wrongfully refusing to compensate Plaintiffs once a benefit to the Qatari Royals had been realized.

165.   Defendants' racketeering acts consisted of, though are not limited to, multiple acts of wire fraud, including transmitting communications through interstate and foreign commerce in furtherance of the scheme to induce Plaintiffs to continue to provide services on materially false pretenses and via materially false representations, to direct and approve Plaintiffs' work for the benefit of the Qatari Royals, to engage in dilatory tactics to conceal the Qatari Royals' true intent to deny Plaintiffs compensation, and/or refuse to compensate Plaintiffs for services rendered after a benefit to the Qatari Royals had been realized, and

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

multiple acts of fraud in foreign labor contracting, including soliciting Plaintiffs, a foreign individual and foreign company residing and based outside of the United States, for employment inside the United States on materially false pretenses and via materially false representations, employing Plaintiffs in the United States, directing and approving Plaintiffs' work in the United States for the benefit of the Qatari Royals, engaging in dilatory tactics to conceal the Qatari Royals' true intent to deny Plaintiffs compensation, and/or refusing to compensate Plaintiffs for services rendered in the United States after a benefit to the Qatari Royals had been realized. Defendants' acts were committed for the unlawful purpose of defrauding Plaintiffs in furtherance of the objectives of the Al Thani Enterprise. In committing these acts, Defendants systematically coordinated their activities, shared essential information between and among the members of the Al Thani Enterprise, and acted as a continuing unit in furtherance of its objectives.

166.    Defendants' conduct constitutes a "pattern" of racketeering activity under 18 U.S.C. § 1961(5) because these activities include at least two acts of racketeering activity within the past ten years. The California Fraud, the New York Fraud, the Saint-Germain Fraud, and the Riviera Fraud undertaken by the Al Thani Enterprise were each initiated and effectuated within ten years of one another. Each of these frauds is related, as they involve common participants, share the same purpose of stealing Plaintiffs' services, and employ the same methods to do so. These related acts of racketeering activity have taken place for over five years. Further, each of these frauds is ongoing and results in continuing harm to Plaintiffs. The Al Thani Enterprise's conduct threatens to continue indefinitely, as there is no indication that the Al Thani Enterprise intends to terminate any of these schemes by compensating Plaintiffs at any point, and Plaintiffs' injuries only continue to increase the longer payment is wrongfully withheld.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

167. Defendants' conduct was designed to injure Plaintiffs, and Defendants have been and continue to be successful in injuring Plaintiffs. As a direct and proximate result of the activities and conduct of Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC in violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered and continue to suffer injury to their business or property within the meaning of 18 U.S.C. § 1964(c) that arose in California and New York. Plaintiffs have suffered and continue to suffer damages and injury to their business, including a financial loss of millions of dollars for uncompensated work performed in California and New York by Plaintiffs. As a direct result of Defendants inducing Plaintiffs to continue work on substantial redevelopment projects under false pretenses and via explicit false representations, Plaintiffs have expended countless hours and immense resources in California and New York, only for Defendants to wrongfully withhold from Plaintiffs fees owed in accordance with their fraudulent schemes. Plaintiffs' injuries arose in California and New York, as Plaintiffs' considerable financial losses were incurred in California and New York, Defendants' activity was conducted with the aim and effect of injuring Plaintiffs in California and New York, and Defendants' fraudulent schemes were undertaken to enrich the Qatari Royals in California and New York. Plaintiffs are, therefore, entitled to recover threefold the damages sustained, in addition to the cost of the suit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c)**
(Against All Defendants)

168. Plaintiffs reallege and incorporate herein each and every allegation set forth in Paragraphs 1 through 167 as if fully set forth herein.

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

169.   As alleged in Count One, one or more of the following individuals and/or entities violated 18 U.S.C. § 1962(c): Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC.  Any person or persons found to have violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Conductor/Participant" for the remainder of this Count.

170.   Each of the Defendants was and is associated with the Al Thani Enterprise, defined *supra*, and they have all conspired with the Conductors/Participants within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).   Each of the Defendants conspired with the Conductors/Participants to conduct or participate, directly or indirectly, in the management and/or operation of the affairs of the Al Thani Enterprise in relation to Plaintiffs through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(B), including multiple, related, repeated, and continuous acts of wire fraud chargeable under § 1343 and fraud in foreign labor contracting chargeable under § 1351 in violation of 18 U.S.C. § 1962(c), for the purpose of stealing Plaintiffs' services.

171.   At all times relevant herein, Defendants intended to and agreed to further an unlawful endeavor of the Conductors/Participants, which, if completed, would violate 18 U.S.C. § 1962(c), and adopted the goal of furthering or facilitating the unlawful endeavor.  Defendants' conduct includes, though is not limited to:

a.      Agreeing to induce and solicit Plaintiffs, a foreign individual and foreign company, to continue to provide management and/or redevelopment services in the United States in support of the Qatari Royals' investments on the materially false pretense and/or via materially false representations that Plaintiffs would be compensated for services performed, when in truth Defendants did not intend to fully compensate Plaintiffs for services performed;

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

b.    Agreeing to make materially false representations that Plaintiffs would be compensated for services performed;

c.    Agreeing to direct and/or approve any portion of Plaintiffs' work on each of these management and/or redevelopment projects for the Qatari Royals' benefit with the knowledge that the Qatari Royals did not intend to compensate Plaintiffs and in furtherance of the fraudulent schemes;

d.    Agreeing to engage in dilatory tactics to conceal the Qatari Royals' true intent from Plaintiffs and luring Plaintiffs into believing that the Qatari Royals would compensate them; and

e.    Agreeing to wrongfully refuse to compensate Plaintiffs once a benefit to the Qatari Royals had been realized.

172.    Plaintiffs were injured by Defendants' racketeering acts or acts otherwise unlawful under 18 U.S.C. § 1962, which included multiple acts of wire fraud and fraud in foreign labor contracting through the Al Thani Enterprise as alleged in Count One.

173.    As a direct and proximate result of the activities and conduct of Sheikh Hamad bin Khalifa, Sheikh Hamad bin Jassim, Sheikha Lulwah, Michele Faissola, Marc Socker, Dilmon, Maybourne Hotels Limited, and Beverly Hills Acquisition LLC in violation of 18 U.S.C. § 1962(d), Plaintiffs have suffered and continue to suffer injury to their business or property within the meaning of 18 U.S.C. § 1964(c) that arose in California and New York.  Plaintiffs have suffered and continue to suffer damages and injury to their business, including a financial loss of millions of dollars for uncompensated work performed in California and New York by Plaintiffs.  As a direct result of Defendants inducing Plaintiffs to continue to complete massive redevelopment projects under the false pretense and via explicit false assurances of compensation, Plaintiffs have expended countless hours and immense resources on the projects in California and New York, only for Defendants to wrongfully withhold from Plaintiffs fees owed in

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA  90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

accordance with their fraudulent schemes. Plaintiffs' injuries arose in California and New York, as Plaintiffs' considerable financial losses were incurred in California and New York, Defendants' activity was conducted with the aim and effect of injuring Plaintiffs in California and New York, and Defendants' fraudulent schemes were undertaken to enrich the Qatari Royals in California and New York. Plaintiffs are, therefore, entitled to recover threefold the damages sustained, in addition to the cost of the suit and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Patrick McKillen and Hume Street Management Consultants Limited respectfully request that the Court issue the following relief:

a.    All actual damages suffered as a result of this fraudulent scheme, in an amount no less than $20 million, which amount continues to grow due to interest;

b.    Treble damages pursuant to 18 U.S.C. § 1964(c);

c.    Attorney fees and costs pursuant to 18 U.S.C. § 1964(c);

d.    Pre- and post-judgment interest; and

e.    Any such other and further relief as this Court may deem just and proper.

Dated:  April 22, 2025          **WILLKIE FARR & GALLAGHER LLP**

/s/ Logan M. Elliott

Logan M. Elliott
Marina A. Torres
Michael J. Gottlieb (*Pro hac vice forthcoming*)
Samuel Hall (*Pro hac vice forthcoming*)

*Attorneys for Plaintiffs*

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

## <u>DEMAND FOR JURY TRIAL</u>

Under Rule 38(b) of the Federal Rules of Civil Procedure and Local Civil Rule 38-1, Plaintiffs demand a trial by jury of all issues so triable that are raised here or that may be raised hereinafter in this action.

Dated:  April 22, 2025          **WILLKIE FARR & GALLAGHER LLP**

/s/ Logan M. Elliott
Logan M. Elliott
Marina A. Torres
Michael J. Gottlieb (*Pro hac vice forthcoming*)
Samuel Hall (*Pro hac vice forthcoming*)

*Attorneys for Plaintiffs*

WILLKIE FARR & GALLAGHER LLP
2029 CENTURY PARK EAST, SUITE 2900
LOS ANGELES, CA 90067
310-855-3000

COMPLAINT FOR VIOLATIONS OF FEDERAL
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT